THE CAYUGE BRIDGE COMPANY, *appellants*, and THOMAS C. MAGEE and others, *respondents*.

Where a company, incorporated for the purpose of erecting a bridge, were authorized to erect the same across a lake *or* the outlet thereof, and to *re-build* it if destroyed or carried away by the ice, and all other persons were prohibited from erecting a bridge within three miles of the place where the bridge should be erected by the company, and the company proceeded and built a bridge *across the lake*, which continued about eight years, when it was carried away by the ice, and the company then erected another bridge, locating it *across the outlet*, about two miles from the site of the first bridge, *it was held* that the building of the bridge across the outlet was, at the time it was built, unauthorized, and that *the restricted limits* were to be measured from the *place* where the first bridge was erected.

APPEAL from chancery. In February, 1826, the appellants filed a bill in chancery, complaining of an encroachment by the defendants in the building of a bridge across the *outlet* of the Cayuga Lake within the distance of three miles of a bridge across the same outlet, built and maintained by the appellants; which encroachment, it was alleged, was in contravention of a prohibition contained in the acts of the legislature relative to the Cayuga Bridge Company, and an injunction was prayed for to restrain the defendants from erecting any bridge at any place within the distance of three miles from *either* of the bridges of the complainants. An injunction was granted accordingly. In April, 1826, a motion was made to dissolve the injunction, which was denied by Chancellor *Jones*, and the cause afterwards having been brought to a final hearing on bill and answer before Chancellor *Walworth*, a decree was made in April, 1830, dissolv-

Cayuga Bridge
Company
v.
Magee.

ing the injunction and dismissing the bill. From this decree the complainants below appealed.

In 1797, the Cayuga Bridge Company was incorporated by an act of the legislature for the purpose of building a bridge *over the Cayuga Lake or the outlet thereof*; the corporation to continue 25 years, and the bridge to be built within three years. By an act passed the 1st March, 1799, the time limited for completing *the bridge across the Cayuga Lake* was extended to the 1st May, 1801, and the duration of the company fixed at 75 years. By this act it was declared that it should not be lawful for any person or persons to erect a bridge or establish a ferry *within three miles of the place* where the bridge *aforesaid* should be erected by the company; and it was also declared that if the bridge to be erected by the company should be carried away by the ice, and should not be *rebuilt* within 18 months thereafter, the charter should be forfeited. A bridge was erected by the company, within the limited time, *across the lake* between the villages of East and West Cayuga, and was kept in repair until the spring of 1809, when it was carried away by the ice. The company within a few months thereafter built a bridge *across the outlet*, about *two miles* north of the site of the first bridge, which they have ever since maintained, *receiving the same tolls* as at the former bridge. In June, 1812, a further act was passed relative to the Cayuga Bridge Company, entitled "an act to *extend* the charter rights of the Cayuga Bridge Company," which, after *reciting* that " whereas the Cayuga Bridge Company have by their petition to the legislature requested an *extension* of the capital stock of said company, for the purpose of erecting a permanent bridge across the Cayuga Lake between the villages of East and West Cayuga, *in addition to their bridge* built over the outlet of said lake; and whereas there are numerous petitions before the legislature from the inhabitants of the western counties of this state, praying for the grant of a lottery to raise funds to erect a bridge across said lake *at the place aforesaid, which have been suspended* in consequence of a concurrent resolution of the senate and assembly directing the attorney general to take legal measures to try the validity of the charter rights of said company; and

whereas a portion of the said petitioners more immediately interested in the erection of a bridge across the Cayuga Lake have signified their acquiescence *in an extension of the charter rights* of the said Cayuga Bridge Company, to enable them to build a bridge across the said lake between the villages of East and West Cayuga, and in that event are *willing to relinquish the application* made by them for the grant of a lottery *for the purpose aforesaid,* provided the said Cayuga Bridge Company shall proceed without delay to build a good and substantial bridge at the place aforesaid, and shall complete the same in a reasonable time ; and whereas the said Cayuga Bridge Company have by their agent consented and agreed to build said bridge on the terms and conditions aforesaid, and to be bound by the provisions and restrictions hereinafter mentioned ;" authorized the Cayuga Bridge Company to increase their capital stock $50,000, for the purpose of building a substantial bridge across the Cayuga Lake, *on the site of the first bridge* erected by the company between the villages of East and West Cayuga, and declared that whenever the said bridge should be completed, the company should possess and enjoy all the rights, privileges and immunities which were granted them by the original act of incorporation. The act exempts certain persons and property from the payment of toll ; forbids any discrimination in the tolls to be demanded at the two bridges of the company ; requires the bridge across the outlet to be kept in repair, and both bridges to be rebuilt if carried away by ice or destroyed ; provides that the bridge to be erected on the old site shall be built and completed by the 1st of November, 1813, or the privileges conferred by the act to cease, and the company to have no other or greater rights and privileges than they legally possessed before the passage of the act of 1812 ; and further declaring, that in case the company neglected to build a bridge across the lake on the old site, within the limited time, they should be deemed to have forfeited all right to build such bridge which they might have had by virtue of any law of the state ; and that the legislature might authorize the erection of a bridge by any other person or persons or body politic and corporate, at their pleasure, across the said lake

at the place aforesaid, any thing in the act incorporating the Cayuga Bridge Company or any other act of the legislature to the contrary notwithstanding.

In pursuance of this act, the company did erect a bridge on the site of their former bridge, within the time limited by the act, which they have since maintained and kept in repair. In April, 1825, the legislature authorized an association of individuals to erect and build a *free bridge* across the Seneca River, near to and *and north of the north boundary* of the charter of the Cayuga Bridge Company, expressly saving the vested rights of such company; in pursuance of which act the defendants associated themselves with others to build such *free bridge;* were appointed a committee to superintend the building thereof; selected and fixed upon a place for the building of the bridge at a point distant *three miles and sixteen rods* from the bridge erected by the Cayuga Bridge Company, on *the site of the first bridge,* between the villages of East and West Cayuga, and distant from the bridge *across the outlet erected by the company one mile and eight rods;* commenced building and were proceeding in the same until restrained by the injunction issued in this cause.

*D. B. Ogden,* for the appellants. By the original act of incorporation, a discretion was given to the company to erect their bridge across the lake *or* the outlet. They in the first instance elected to build their bridge across the lake, but on its being carried away by the ice, they availed themselves of the privilege granted to them, and erected a bridge across *the outlet,* and when they did so, all the privileges granted by the acts of the legislature attached to that bridge; no other bridge could be erected, conflicting with the rights of the company, within the distance of three miles of the bridge erected by them. When the act of 1812 was passed, the bridge of the company across the outlet was standing, and the company exacted and received the same tolls which they had received at their first bridge; and though the legislature authorized the erection of a *free bridge,* they directed that it should be built north of the north boundary of the charter of the company, and expressly saved the rights of the company.

Resort is had by the respondents to the phraseology of that part of the act of 1799 which provides that a dissolution of the company shall not take place by reason of the bridge being carried away by the ice, if it be *rebuilt* within 18 months, &c. for evidence of the intention of the legislature that a bridge, if rebuilt, should be rebuilt at the *same place;* it is, say they, the *said bridge,* and it is to be *rebuilt,* &c. This construction on the part of the appellants is too literal, and could not have been contemplated by the legislature. The object was to secure a bridge for the public accommodation; the right had originally been given to the company to erect one over the lake *or* the outlet, and the only sound construction is, that whenever *the bridge* across the lake *or* the outlet was carried away, a bridge across the lake *or* the outlet should be rebuilt within a limited time, or the charter should cease. It could not have been contemplated, by the use of the word *rebuild,* that the new bridge was to be constructed from the same materials, in the same form, and on the identical spot on which the first bridge was located. There is not a word in the act of 1799 limiting or restricting the powers originally granted, nor is there any thing in the act of 1812 which deprives the appellants of rights previously conferred; for, admitting the company to be bound by their consent as set forth in the preamble of the act to build a bridge on the site of the first bridge, on the terms and conditions, and subject to the provisions and restrictions contained in the act of 1812, there is no complaint of a non-compliance with the terms and conditions, or of a violation of the provisions and restrictions. Indeed, had the company omitted to build a bridge on the old site, the act of 1812, instead of operating against them, would have been evidence of recognition of the existence of the corporation. The act of 1797 is declared to be a *public act,* and to be benignly and favorably construed, and the other acts being on the same subject are to be considered as together forming but one law.

ALBANY,
Dec. 1830.

Cayuga Bridge
Company
v.
Magee.

ALBANY,
Dec. 1830.

Cayuga Bridge
Company
v.
Magee.

*B. F. Butler,* for respondents.   The erection of the bridge *over the outlet* was unauthorized ; by the act of 1797, the company might erect a bridge over the lake *or* the outlet, but they could erect only *one bridge,* and when they had built a bridge *over the lake,* the right of building a bridge *over the outlet,* considered as an *original right,* was at an end.   The act of 1799 gave no power to build a bridge *over the outlet;* it, as well as the act of 1797, gave the right of erecting but *one bridge* and when that right was exercised, no other *new bridge,* could be erected.   The erection of the bridge over the outlet was not a *rebuilding* of the first bridge.   The word *rebuild* should receive its ordinary signification ; it means, "to build again ; to renew a structure."   In common parlance, rebuilding comprises not only the erection of a structure upon the same site, but an appropriation of part of the original structure.   It is admitted, however, that a reasonable construction would have justified an alteration of the form or materials of the bridge, and a partial change of location, provided that the meaning and intent of the act was preserved.   The statute speaks of *the bridge destroyed* and of the *rebuilding* of *the bridge,* not of the erection of *a new bridge.* The placing of a bridge two miles from the site of the first was in no sense *a rebuilding* of the first ; it was the erection of a *new bridge.*   The prohibition to others to erect a bridge within three miles of the bridge of the company, gave no right to the company to erect a new bridge at any point within the chartered limits.   The act of 1799 is a *private act,* to be construed strictly in reference to all matters of a penal character or derogatory of common rights.   The only effect of the declaration that the act of 1797 shall be considered a *public act* and be construed favorably, is to relieve the corporation from special pleading ; but it confers no greater rights than if such declaration had not been made.   The prohibition being of a penal character and in derogation of common right, will be strictly construed, and will not be extended by implication ; and, above all, will not be made *ambulatory* by construction.   The prohibition is contained in the act of 1799, and by that act no discretion is given as to the location of the bridge.   Could the company change the site

of its bridge, such change could not draw after it the prohibition so as to extend it to a new district of country. By the terms of the act of 1799, it applies only to a bridge to be erected *across the lake,* and *to be completed previous to the 1st May,* 1801. The act of 1812 neither varies or extends the prohibition; it attached to the new bridge across the lake, when completed, and left the bridge over the outlet without such protection. Such protection is not given to the bridge over the outlet in express terms by the act of 1812, nor is it necessarily implied; the rights, privileges and immunities in this respect conferred by that act are applicable only to the bridge *to be erected.* The act *restores* the company to its former rights, but does not *grant* a new right extending the prohibition to *eight* instead of *six* miles. Such immunity can be claimed only by implication, and will not be conceded by the court unless it be a necessary and inevitable implication. The act of 1812 does not require it, as all its terms may be satisfied, and force and effect given to all *its* provisions, without such implication. The mischiefs intended to be remedied by the act of 1812 were, that the bridge *over the lake* had been destroyed and *not rebuilt;* the company had changed the location and erected a new bridge, by which it was alleged they had forfeited their charter; the subject was in litigation; the public had lost the benefit of a bridge on an old established route, and asked leave to erect a new bridge; the company had not sufficient capital to rebuild it, and remonstrated against the building of a bridge by others. The remedies, therefore, were to enable the company to raise funds to rebuild the bridge over the lake; to silence *disputes* as to the validity of their charter; and *to remove doubts* as to their right to take toll at the bridge over the outlet. These remedies were provided; and to obviate the existing mischiefs, it was not necessary to extend the prohibition to the bridge over the outlet, it having already a reasonable protection, being one mile within the chartered limits of the company. Had such extension been intended, it would have been so declared. The provisions in the act shew that nothing in reference to that bridge was meant to be left to implication. The second section of the act strongly implies that

the bridge over the outlet should be so far legalized as to authorize the company to take toll for crossing it; and yet, by a subsequent section, the right to take toll *at that bridge* is *expressly given,* whilst nothing on that subject is said as to the bridge over the lake. Why? Because the general revival of the powers of the company was deemed sufficient to authorize the taking of toll at the bridge over the lake, but not at the bridge over the outlet, and therefore the express grant was made. It is also very evident that at the passage of this law the company did not claim that the prohibition extended to the bridge over the outlet; for if such claim had been made, they unquestionably would have insisted upon a declaration to that effect being inserted in the act, as well as a provision authorizing them to take toll at that bridge. Again, the act of 1812 is manifestly the result of a compromise between the citizens who had petitioned the legislature and the company. It is said, for the appellants, that this act is a recognition of the existence of the corporation, for that the charter would have been lost unless the bridge over the outlet had been considered a rebuilding within the terms of the act of 1799. On the contrary, it is contended that from the whole scope and tenor of this act, and particularly from the last provision in it, the legislature considered the rights of the company as forfeited; for, upon the failure of the company to erect a bridge according to the terms of that act, the legislature reserved the right to authorize the erection of a bridge across the lake by any other person or body politic; any thing in the act incorporating the Cayuga Bridge Company, or any other act of the legislature, to the contrary notwithstanding: and it is not to be presumed that an extension of the prohibition would have been consented to, or that the legislature meant to grant more than what they expressly declared. Besides, the act of 1825 proceeds on the assumption that there is a vacancy north of the north boundary of the charter of the Cayuga Bridge Company, and between that and the chartered limits of the Montezuma Bridge Company, where a free bridge might be built without invading the rights of either company. The geographical fact is, that there is such vacancy if the bridge of the company be

located between the villages of East and West Cayuga, but otherwise not; and in a question of doubt, this legislative exposition of the rights of the parties is justly entitled to consideration.

*Ogden*, in reply. Can it be doubted but that the company had the right originally, under the acts of 1797 and 1799, to erect their bridge *over the outlet* instead of *over the lake*, had they elected so to do? When their bridge was carried away by the ice, the discretion originally vested remained, and when they built their bridge *over the outlet*, all the rights, privileges and immunities granted, attached to that bridge. Had rights accrued to other persons in the mean time, by the establishment of a bridge or a ferry at the distance of more than three miles from the site of the first bridge, it is conceded that the company, by changing the location of their bridge, could not have interfered with those rights; but such interference is not shewn or pretended. Besides, the act of 1812 expressly recognizes rights and privileges as existing in the company, although they should not avail themselves of the additional privileges granted by that act.

The following opinions were delivered :

By Mr. Justice SUTHERLAND. The appellants are the proprietors of two toll bridges over the Cayuga Lake ; the one over the broad waters of the lake between the villages of East and West Cayuga, the other over the outlet about two miles north of the first. The respondents are an association of individuals, who, in 1826, under an act of the legislature passed 16th April, 1825, commenced the building and erecting of a free bridge over the same outlet, a little more than one mile north of the most northerly bridge of the appellants.

The appellants contend that by the acts under which their bridges have been erected, all other persons are prohibited from erecting any bridge over the Cayuga Lake or its outlet, at any place within three miles of either of their bridges, or at all events, within that distance of their bridge over the outlet. The respondents, on the contrary, maintain that the exclusive privileges of the appellants is limited to the distance

of three miles in each direction from their bridge between East and West Cayuga. It is admitted that the place where the respondents commenced their operations is more than three miles from that bridge, and about one mile only from the other.

The chancellor decided that the respondents were authorized to erect a free bridge at the place where they had commenced building the same; thereby affirming that the exclusive privilege of the appellants is restricted to three miles from their bridge across the lake from East to West Cayuga. Upon a careful examination of the case, I am of opinion, that the chancellor has given the true construction to the acts of the legislature under which the appellants claim.

It is obvious that neither the legislature nor the company contemplated the erection of more than one bridge under the acts of 1797 and 1799. The company could not have built two bridges at the same time, the one over the lake and the other over the outlet. They were to build a bridge over the lake *or* outlet, at such place as they thought proper. They had an unlimited discretion as to the original location; but when that discretion was exercised and a bridge was built, their grant was located, and their exclusive privilege attached to the distance of three miles in each direction from that spot. It cannot admit of a doubt that the legislature had a perfect right, immediately after the first bridge was built in 1801, to have authorized the erection of another bridge at any point upon the lake or outlet, more than three miles distant from that bridge. What possible objection could have been raised against such an act? could it have been said that it interfered with any vested or even contingent right of the appellants? would the argument have been urged, that perhaps the bridge of the appellants might be destroyed, and then they might wish to *rebuild* it at some other place? I apprehend the answer would have been conclusive, that the rights of the appellants are fixed and ascertained; they have located their bridge; their grant is no longer ambulatory, and the right of the legislature is as perfect to authorize the erection of another bridge three miles and an half from that, or at the head, as the middle of the

lake; and they might have incorporated in this second grant the same prohibition as is contained in the act of 1799 against the erection of any other bridge within three miles of the last. If these positions are sound, it would seem necessarily to follow that the appellants had no right to rebuild or erect a new bridge after the destruction of their first bridge in 1809, at any other place than where that had stood. They derived all their rights and powers from their charter; whatever that gave them they were entitled to exercise, and what it did not give they had no right to, whether the legislature had granted them to any other person or not. It is a fair test of the extent of their rights, therefore, to inquire whether an act, such as I have supposed, authorizing the erection of another bridge three miles and one rod from the first bridge of the appellants, and prohibiting the erection of any other bridge within three miles from that, would have been valid. If it would, it would have been because the appellants had no vested rights incompatible with the provisions of such grant, and of course had no right, under any circumstances, to rebuild or erect a new bridge within three miles of the last. That such a grant would have been valid, appears to me too clear to admit of argument. When the company located their grant and erected their bridge, their situation and rights were precisely the same as though that place had been particularly specified in the charter; and I am therefore inclined to the opinion that they had no right to erect a new bridge at another place, under the authority which they possessed of rebuilding the old one. It must have been foreseen that when this bridge was built, the arrangements and improvements of the neighboring country would be partially affected by it; that villages would probably spring up at each extremity; that turnpikes and other roads would be made with reference to it, which would be of no use to the public without the bridge. It was undoubtedly under the influence of considerations like these, that the legislature made it an express condition of the grant, that if the bridge should remain impassable for 30 days, or if carried away by the ice, should not be *rebuilt* in 18 months, the charter should be forfeited, so that another company might be created for the same pur-

pose, or a free bridge erected by those who had an interest in the subject, and had invested their capital in local improvements, upon the faith that this means of communication would be preserved. I do not think the bridge erected by the company over the outlet in 1809 was a rebuilding of their first bridge, within the meaning of the charter. If it was not, none of the peculiar privileges conferred by that charter could attach to it, although the charter was never formally avoided.

But admitting that the company had a right to rebuild at any place, within three miles either north or south from their first bridge, I should still hold that the restricted limits were to be measured from the place where the first bridge was erected. The language of the 2d section of the act of 1799, which contains this prohibition, is very explicit; it prohibits the establishment of any other bridge or ferry within three miles of *the place* where the *said bridge* should be erected by the company ; that is, the bridge to be erected under the act of 1799. Suppose the prohibition had been contained in a separate act, passed after the bridge had been built, and had forbidden the erection of any other bridge within three miles of *the place where the said company had built their bridge?* It would hardly be contended that under such a provision, any subsequent act of the company could extend or change the limits to which the prohibition applied.

When the circumstances under which the act of 1812 were passed are considered, I think no inference is to be drawn from it, favorable to the claims of the appellants. It confirms their original charter, *upon condition* that they erect a new bridge upon the site of their first bridge between East and West Cayuga, and recognizes the bridge near the outlet, by authorizing the company to take the same toll there as is allowed by the acts of 1797 and 1799. But it expressly declares, if the new bridge is not erected, they shall acquire no additional rights by the passing of that act. The act was a matter of compromise between the company and the inhabitants of the neighboring country, who contended that the company had forfeited their charter by omitting to rebuild the bridge on its original site. But they were wil-

ling the charter should be confirmed, if the company would rebuild. But there is nothing in the act from which it can be inferred that the legislature recognized the right of the company to erect a bridge across the outlet. It is somewhat remarkable, that when the company thought it necessary to insert in the act an express provision authorizing them to take toll at that bridge, they did not also cause it to be expressly provided that their chartered limits should extend three miles farther north. I apprehend no such pretension was at that time thought of or asserted. The act of 1825, under which the respondents commenced their bridge, saves the vested rights of all parties, and has no bearing on the question presented by this case.

On the whole, I am of opinion that the injunction was properly dissolved, and that the decree below ought to be affirmed with costs.

By Mr. Senator THROOP. The original act of the 28th March, 1797, as amended by the act of 1799, only provides for the mere existence of the corporation. Although its preamble expresses the object of the incorporation to be " the building a bridge across the Cayuga Lake," the choice of building their bridge over the lake *or* the outlet was left to the company. The act for opening and improving certain roads within this state, passed on the same 28th March, 1797, shews the understanding of that legislature that the bridge was not to be erected over the outlet, but over the lake. It directs an expenditure upon the old Genesee road, so called, (which at that time crossed the lake where a ferry was established, about $\frac{3}{4}$ of a mile above the place where the bridge was built,) " except in that part thereof which deviates from the place where the intended bridge over the Cayuga Lake is to be erected ;" instead thereof a road was to be opened " from the said place, to intersect the Genesee road on the east and west sides of the lake." It seems to have been an object with the applicants to possess the power of building either over the outlet or the lake, probably to so locate their bridge as most effectually to prevent competition and secure the greatest amount of tolls, while from the act

ALBANY,
Dec. 1830.

Cayuga Bridge
Company
v.
Magee.

referred to, it appears that the expectation was prevalent at the time, that not the outlet, but the lake would be selected. It is to be observed also that the original act contemplates but one bridge. It does not authorize the company to erect one at each place, but *a bridge* at either place ; and it does not contain any prohibition such as that contained in the second section of the act of 1799, under which this cause has arisen.

Whatever were the reasons in 1797 for obtaining or granting the choice of a location of the bridge, they seem to have ceased when the law of 1799 was applied for and granted. This act repeals certain sections of the original act, leaving only such parts as were necessary to uphold the association which had been formed under it, and enlarges all the powers and privileges of the corporation, and more effectually secures them in their enlarged rights. This new charter, (for such it was intended to be,) is applied for by this company after an existence and operation of nearly two years. The deficiencies in the first, for all the purposes contemplated by the parties and the state, had been ascertained ; and it is to be now taken that it contains all the powers which were necessary for the company, and which the state was willing to confer to carry into complete effect the intended grant. Besides, the prohibition in the second section here first introduced, granting exclusive privileges within the limits of three miles each way from the place where the bridge should be erected, is in derogation of the common right of the citizen to pass over the lake where and as he shall see fit. In 7 *Cowen*, 34, it is decided under this section that no person can cross the lake upon the ice within these limits, without paying toll. Upon both these considerations the act of 1799 should not be construed so as to confer upon the company powers and privileges which are not expressly granted or clearly implied.

But it is contended that the act of 1799 did not take away the right possessed under the original act of building over the outlet ; although the question is not material in settling this case, as I view it, which depends upon the situation and extent of the exclusive limits, I think it did. The outlet is

not mentioned in this act ; all its provisions refer directly *to the bridge over the lake* to be completed by the first of .May, 1801. As it repeals all parts of the original act which provide for tolls or grant any privileges and immunities, if the power remains in the parts not repealed, it can only be of building a free bridge, at which they could not stop a passenger nor demand toll. Although it is highly probable that the public would not have objected to the exercise of a power to thus *abridge* the right of locomotion, the prohibition in the second section of this act against the erection by any person of any other bridge within three miles each way of the bridge to be built by the company by the 1st May, 1801, extends to and does not except-this company.

The fact appearing from the act referred to, of the same date with the original act, that at that early day a particular location was in view *over the lake,* and not *over the outlet,* taken in connection with the increased and precise knowledge of the company after an existence of two years, will warrant the supposition, that when the new charter was granted, the bridge had been commenced, and its location, as a well known and designated place, was in the contemplation of all parties in framing and passing this act. The first section uses the words, " for completing the bridge," and not " for building a bridge." But whether we are authorized to assume, either from our knowledge or from the provisions of the act, that the company had actually commenced the building of their bridge at the time of framing and passing this second act, a location had undoubtedly been made, and hence the omission of the word *outlet* or any reference to it. The company having the power of locating at will under the act of 1797, if they had established their bridge over the lake and excluded thereby the outlet, their power in regard to locating was executed and gone. There was no propriety or use in retaining the word, nor any necessity of repealing the original enactment in the new charter. If such location had not been made, it would in all reason have been found in the same connection again in this act. This supposition is confirmed by all the provisions of the act. In the first section, " the time for *completing* the bridge over the Cayuga Lake,"

and "if *the said bridge* shall be completed," are the terms used, and not the time for building and completing, or if the said bridge shall be located, built and completed.

But further, the second section, the prohibition against any person or persons, (not excepting this company,) from erecting any bridge or establishing " any ferry or ferries within three miles of *the place* where *the bridge aforesaid* shall be erected and built by said company," is a new and additional privilege. It is not in the original act, nor does that grant the company any other protection from competition than what might have been secured by their choice of location ; and whatever reasons or objects might have made it expedient in the first act to obtain the power of locating on the lake or the outlet, they are more completely effectuated by this new section. It is not to be supposed that such an exclusion would have been granted by the legislature, unless there had been such a location whereby the place and the precise situation and limits became established and well known. The proviso in the eighth section, using the words " at any of the places in this act designated," would be senseless if no location had been made. The language shews that the whole act was framed in reference to a particular situation, that the place was known, not *to be* designated by any erection thereafter to be made, and this provision can only refer to the prohibitory second section. Upon the whole, I cannot avoid considering this second section as explicit as if it had contained a particular description of the place, and then prohibited all persons from erecting any bridge within three miles each way of the place described.

If this deduction from the terms and provisions of the act of 1799 is correct, or if the fact could be established out of the act, it then necessarily follows, that as all the provisions of the act of 1799, were passed in reference to a well known and designated place, a bridge completed at any other place would not have been a compliance with the requirements of that act, nor within the authority granted. Its effect upon the question, as to the situation and extent of the exclusive limits of the company, might not be so important, because the completion of the bridge by the 1st May necessarily made

the point precise, from which the limits were to stretch out each way. From both views, therefore, I consider that down to the time of the destruction of the bridge by ice in 1809, the three miles each way from this place were as distinctly settled and laid down upon the lake as if they had been designated by monuments standing precisely six miles apart, and equi-distant from the place referred to in the act; and as such they were permanent and immoveable. The words of the section, are: "It shall not be lawful for any person or persons to erect any bridge, or establish any ferry or ferries within 3 miles of *the place* where *the bridge aforesaid* shall be erected and built by the company." *The bridge aforesaid* is the bridge to be completed by the 1st May, 1801, and is not *a bridge* or *the company's bridge;* and the place of such bridge, I have considered as a well known situation within the contemplation of the legislature in this enactment. This prohibition attaches to *the place* and not to the bridge, much less to any bridge of the company to be thereafter built upon a different and distant site. The bridge is used in this section only to describe the place, the point whence the charter limits are to extend each way, which is to continue fixed, after the bridge should be destroyed by ice, and thereafter for 18 months, when there might be no bridge to indicate the exclusive limits of this company. For 10 years, from 1799 to 1809, these limits were settled, known and distinct; can it be said that they were then detached from their firm foundation, made to move down to the outlet 2 miles, and there to stretch out again to the prescribed extent? or, can it be said that this prohibition attached or can attach to *any* bridge *over the outlet;* a place in nowise alluded to in this section nor in the whole act? It cannot be, because by its terms it is not attached to any bridge, but to the site then known or to become so by the completing of the first bridge in May, 1801.

It is not insisted that the act of 1812 materially bears upon this question respecting the charter limits, except as a legislative declaration of the company's right under the original acts, to build the bridge over the outlet after the destruction of the first; to which, it is contended, the privileges and immunities of the company attached at once. My opinion

ALBANY,
Dec. 1830.

Cayuga Bridge
Company
v.
Magee.

has been sufficiently indicated that they had no such right; that their charter rights resulted from, and were dependant upon, their completing, preserving and rebuilding, when necessary, the bridge over the lake. But if they had such right the consequences contended for, particularly so far as respects the extension and removal of their charter limits, by no means follows. This company built a bridge over the lake by or before the 1st May, 1801, as authorized and required by their charter; the prohibition attached to the place where that bridge was built, and not to the bridge itself. They surely did not move that place by moving the location or site of the bridge, and unless they did, the exclusive limits must remain the same in extent and situation as they were before the bridge was built over the outlet in 1810. If this prohibition was found in the act of 1797, where the choice of location over the lake *or* over the outlet is given, there would be more plausibility (though no more truth as I can perceive) for saying that it attached to and was dependant upon the company's bridge, and not to this site; but it is not, and unless the limits of the prohibited ground. are extended in the act of 1812, there is no foundation for the assumption. That act was the result of a compromise between the company and the public more immediately interested in having a bridge rebuilt upon the site of the old one; by which the company succeeded in arresting legal proceedings to dissolve the corporation upon the forfeiture provided for and declared in the 8th section of the act of 1799. The 2d section enacts, that when a substantial bridge crossing the lake upon the site of the first one shall be completed, the company shall have, possess and enjoy all the rights, privileges and immunities which were granted to them by the original act of incorporation, and the several acts amending the same; and the 3d section legalizes their bridge over the outlet. In this act no authority is found for the attempted extension of the original prohibition, and consequently no reason why the respondents may not lawfully erect their bridge at the proposed site.

I am therefore of opinion that the appellants have failed to shew that the place selected by the respondents for their

bridge was within the prohibited limits, and that the decree of the chancellor ought to be affirmed.

This being the unanimous opinion of the court, the decree of the chancellor was thereupon *affirmed* with costs.