Gales et al. *v.* Anderson et al.

---

JOSEPH GALES et al., Plaintiffs in Error, *v.* DAVID B. ANDERSON et al., Defendants in Error.

ERROR TO HENDERSON.

A license to keep a ferry between certain points, extending three miles on the Mississippi River, is not exclusive to that extent, but authorizes the establishment of the ferry from any point within the three miles, and when established, other ferries may be licensed within the same limits, so that they do not interfere with the ferry-ways of the ferry first established. The ferry-ways of the ferry, when located, extend only so far as may be necessary for a convenient landing, and though the owner may have the right, as exigencies require, to change his ferry-landing after he has once established it; yet he has no such exclusive right of ferryage within the prescribed limits, as would prevent the licensing of another ferry within those limits.

The County Commissioners' Court, under the law authorizing that court to grant ferry license, was not authorized by any exclusive grants it might make to divest itself of the power to grant other ferries, within any prescribed limits, whenever the public good should require the exercise of that jurisdiction.

THIS bill in chancery was filed to perpetually enjoin the de-
35*

fendants from interference with complainants' ferry privilege in Henderson county.

In August, 1846, the complainants filed in the Circuit Court of Henderson county their bill in chancery against David B. Anderson and Henry L. Anderson, wherein they allege, that on the 5th day of September, 1842, that the County Commissioners' Court of Henderson county, at a regular term of said court, passed and entered on the records of said court as follows, to wit:

" Ordained, that Thomas L. Thruston and John F. Webb have a license to keep a ferry across the Mississippi River, from the mouth of the running slough, above the residence of Thomas Morgan, and opposite the city of Burlington, to extend down said river to where the slough enters into the Mississippi River, or big slough opposite the small island; that they shall have the privilege of landing at Montreal in high water. And it is further ordered, that an order passed the 7th of September, 1841, granting license to William H. Manro to keep a ferry, be rescinded."

The bill then alleges, that in pursuance of said order, and in conformity thereto, a license was in September, 1842, duly issued by the clerk of said court, to Thruston and Webb, they having first given bond, and otherwise complied with the laws of the State relating to ferries, authorizing them to keep a ferry across the Mississippi River, opposite Burlington, from the point where the running slough commences near Thomas Morgan's, and down to where said slough empties into the river, or big slough, near the small island, with the right of landing at any point on the Mississippi River between the commencement and outlet of said running slough; and also to land at Montreal at high water.

The bill then alleges, that Thruston and Webb, immediately after the granting of the license, and by virtue of the power, authority, and privileges thereby conferred on them, placed upon the Mississippi River, at the place mentioned in the license, a good, substantial, well-furnished steam ferry-boat, to run as a ferry between Burlington and that part of the Illinois shore of said river mentioned in their license, and which boat was adequate to the accommodation of the public and to the transportation of all persons and property to be ferried over the river within the limits

of their license; and that from that time to the 6th of August, 1845, they kept the said boat well manned and provided for the ferriage, and did ferry all persons and property offered for ferriage across the river within the limits of their license; and that on the said 6th day of August, 1845, Thruston and Webb, by writing, under their hands and seals, on the back of said license, for valuable consideration, assigned and transferred said ferry license, and all the rights, privileges, and appurtenances arising under or growing out of the same, and delivered the said license to them and put them in the peaceable possession of said ferry, ferry privileges, steam ferry-boat, and furniture, and all things pertaining thereto; and that from that time to the commencement of the suit, the complainants had kept up and maintained said ferry, ready and prepared for the transportation of persons and property across the river within their ferry limits; the assignment of the ferry is as follows : —

" Know all men by these presents, that we, Thomas L. Thruston and John F. Webb, the parties named in the within license, having heretofore held the same as trustees and agents for Joseph Gales and William W. Seaton, and for their use do, in consideration thereof, and at the request of the said Gales and Seaton, and for the consideration of one dollar to us by them in hand paid, by these presents assign, transfer, and set over the said license, and all the rights, privileges, and appurtenances thereunder unto them, the said Joseph Gales and William W. Seaton, their heirs, executors, administrators, and assigns forever. Witness our hands and seals, this 6th day of August, in the year of our Lord, 1845.

" THOMAS L. THRUSTON, [SEAL.]
"JOHN FREEMAN WEBB, [SEAL.]"

The bill then alleges, that Thruston and Webb were only the agents and trustees of the complainants, who were the real parties in interest, and that the complainants furnished the said ferry-boat and equipments at a cost of $7,000; and that they had since expended in repairs and in keeping their ferry in order, for the transportation of persons and property, about $2,000 per annum, and still maintain and keep up their ferry at about that

annual expense; that they are owners of the following real estate in fee-simple, to wit: —

1. The north subdivision of the north-west fractional quarter of section four, in township 9 north, and range 6 west, containing 54 and 76 hundredths acres.

2. The north-west fractional quarter of section nine, in township 9 north, 6 west, containing 9 acres.

3. The south subdivision of the north-west fractional quarter and the south-west fractional quarter of section four, in township 9 north, 6 west, containing 92 and 34 hundredths acres.

4. The north subdivision of the north-east fractional quarter of section nine, in township 9 north, 6 west, containing 39 and 85 hundredths acres.

5. The south subdivision of the north-east fractional quarter (including the south-east fractional quarter) of section nine in township 9 north, 6 west, containing 44 and 2 hundredths acres.

6. The north-east fractional quarter of section 33, 10 north, range 6 west, containing 153 and 5 hundredths acres.

7. The north-west fractional quarter of section 33, in township 10 north, and range 6 west, containing 46 and 93 hundredths acres.

8. And the bill alleges that the complainants were the equitable owners of the west half, south-west fractional quarter of section 33, in township 10 north, range 6 west, containing 29 and 90 hundredths acres.

And with the bill the complainants exhibit title-papers, from which it appears that in March and April, 1846, the complainants acquired the legal title to the lands numbered 1, 2, 3, 4, 5, and 6, and that John F. Webb and Thomas L. Thruston, by their deed, dated the 23d day of October, 1845, duly conveyed to the complainants, their heirs, executors, administrators, and assigns, as tenants in common, the piece of land above numbered 8, with all and singular the rights, ways, franchises, ferries, privileges, and improvements, and appurtenances, to the same belonging, or anywise appertaining, and to the charters, licenses, franchises, and ferry privileges, now and heretofore held and used by or in the name of the said Thruston and Webb, or either of them, between the said town of Burlington and the said Illinois

shore, with the steam ferry-boat Shokoton, and as a ferry-boat between those places, to have and hold, &c., the said lands and appurtenances, franchises, &c., to the complainants, &c., forever; and all of which lands the bill alleges are situated in Henderson county, in this State, and bounded on the west by the Mississippi River, a stretch along the bank of the river three miles, and are all included within the grant of the said ferry privilege, granted to Thruston and Webb, and assigned to the complainants, and constitute their landing for said ferry; that ever since the grant of said ferry privileges to Thruston and Webb, an annual tax has been paid therefor to the county of Henderson.

The bill then adds, that after the grant of the said ferry privileges to Thruston and Webb, and after they had put the ferry into full and successful operation, with boat properly manned and equipped, and ready and able to fully accommodate the public, and was employed in so doing, to wit, on the 25th day of July, 1844, the County Court of Henderson county, on the application of the defendants, David B. Anderson and Henry C. Anderson, made the following order, to wit: —

" Ordered, that the clerk of this court issue a license to David B. Anderson and Henry C. Anderson, of Burlington, Ia. Territory, to run a horse ferry-boat across the Mississippi, from the Illinois shore to Burlington, with the privilege of landing as far north as the road near the line between township 9 and 10 north, 6 west, and have the privilege of landing at Shokoton when the water is high, or any intermediate point, upon the condition that they pay ten dollars tax and file his bond with approved security, conditioned according to law.

The bill then alleges, that from the road mentioned in this order, for one and a half miles south down the river, is included in the grant to Thruston and Webb, which has been assigned to and belongs to the complainants, and that said one and one half miles constitutes the most important part of complainants' landing; and that the land for said one and one half miles belongs to complainants, and that there is no landing within that distance except what belongs to complainants, and that the said grant to the Andersons was without the complainants' consent, and without compensation to them, and without their franchise having

Gales et al. *v.* Anderson et al.

been in any manner disused, forfeited, or abandoned; that the said D. B. & H. C. Anderson, immediately after the said order granting them a ferry privilege, a horse ferry-boat on the Mississippi River at said point, and from that time to the present, at intervals, when the water was low, and when the complainants' franchise was most valuable to them, have continued to run said horse-boat across said river as a ferry, and to land on the land of the complainants, and within the boundaries of their prior grant, to transport persons and property for hire across said river, and landed them upon complainants' landing, to their great injury and diminution of profit; that complainants have expended $20,000 in securing their ferry privileges, purchasing land, and erecting buildings, and furnishing boats, &c., therefor, and running and keeping the same in repair, and at all times ready to accommodate the public as a ferry; and that in consequence of the aforesaid interference with their said franchise, they have thus far sustained a net loss of several thousand dollars; that when the river is high, the ferrying difficult, and the profits small, the said Andersons withdraw their said ferry-boat, but when the river is low, so that a landing can be effected on complainants' land, ferrying easy and abundant, and profits good, the defendants replace their ferry-boat at their ferry, and use the same in the transportation of persons and property for hire, landing on the complainants' land, and within the limits of their prior franchise, and thereby diminish the complainants' profits, so that their expenses exceed their profits.

The bill then alleges, that the grant of said ferry franchise to Thruston and Webb was exclusive within the limits embraced in the grant, and that the County Commissioners' Court of Henderson county had no power or authority to make a subsequent grant of a ferry privilege covering the prior grant under which the complainants claim, without compensation being first made to them therefor, and that the said grant to the Andersons, so far as it interferes with the prior grant, is void; makes D. B. & H. C. Anderson defendants, and prays that an injunction issue against them, enjoining and restraining them and all persons acting under them, from ferrying across the said Mississippi River within the limits of the said grant of complainants, and from transporting

persons and property across said river and landing them on the land of the complainants or within the limits of their grant, and from interfering in any way with the rights of the complainants in their said ferry; and that on a final hearing, said injunction might be made perpetual, with a prayer for general relief. Injunction issued according to the prayer of the bill.

In November, 1846, the defendant, Henry C. Anderson, filed his answer to the bill, alleging that before the grant of the ferry franchise to Thruston and Webb, there was a State road leading from Peoria to Burlington, and that a part of it was reviewed and located in 1841, under an order of the County Court of Warren county, from the bluff to the Mississippi River, which is the road mentioned in the above order granting ferry license to the Andersons; that before the order granting ferry to Thruston and Webb, a license to keep a ferry, and to land where said road terminated at the Mississippi River, had been duly granted by the Henderson County Court to John Phillips, or some one under whom he claimed, and that in pursuance of said license, a ferry had been run across the river, landing where the Andersons landed, till long after Thruston and Webb commenced running their ferry, so that Phillips or his grantors had the first ferry right and the first ferry-boat landing at the termination of said road; and that Thruston and Webb afterwards obtained their order and license, and established their ferry, running north of said State road; and that two ferries were considered necessary by the authorities on both sides of the river.

The answer admits that Thruston and Webb obtained an order and license to keep a ferry, as stated in the bill, and that they executed bond, took out license, placed a boat, and commenced running their boat pursuant to license; admits the boat cost $7,000, and that awhile they continued, kept and run said boat well furnished and equipped according to the license; denies they always did so, and charges that on one occasion they run their boat to St. Louis, and had no ferry-boat at the ferry for about six weeks; admits that Thruston and Webb, by indorsement on their license, for a valuable consideration, assigned to the complainants their ferry line, boat, furniture, ferry privilege, as alleged in the bill; but cannot admit that complainants have,

since the assignment to them, regularly kept their boat well manned and furnished to transport all persons and property across said river, or that they have done so, but say, on the contrary, that they have engaged in commerce with their ferry-boat, and have at periods abandoned the ferry with the boat, and run her up the Fever River for wheat, and up to Oquaka and down to Nauvoo with passengers, leaving no other boat at the ferry; admits the execution of the title-papers exhibited in bill, but denies that complainants were the legal or equitable owners of any of the lands therein described, till long after the grant of the ferry to the Andersons; denies that the complainants own all the lands on the Mississippi shore continually to the distance stated in the bill, and particularly the land on which said State road terminates, which belongs to W. H. Manro, who has long owned the same, being west half of the south-west fractional quarter of section thirty-three, ten north, six west, or that complainants or Thruston and Webb own, or ever owned, the first two tracts below the mouth of the running slough mentioned in their license; that after Phillips left his said ferry and took away his boat and abandoned the ferry, the County Commissioners' Court granted to the Andersons the ferry-privilege, and made the order stated in the bill; that they, on obtaining their license, placed a good horse ferry-boat on the river at the cost of $900, and continued to run, according to their license, in high and low water, and exercised said ferry-privilege legally and without interruption until D. B. Anderson transferred by writing his interest therein to John H. Goff and Isaac Nixon, in June, 1846; and since that time the respondent and Goff and Nixon have continued the ferry-boat, till they recently substituted and run in her place a superior new horse-boat at the cost of $1,500; admits that complainants have paid all taxes and bonuses required by Henderson county, and that the one and one half miles south of the State road is as important as any part of the three miles mentioned in the bill; denies the defendants withdrew their ferry-boat at high water, but says their boat was always running, and at times when the complainants' boat was laid up; alleges that after the ferries of Thruston and Webb and of the defendants were both established according to law, and both ne-

cessary or at least convenient for the public, the complainants purchased of Thruston and Webb, subject to the ferry privilege of defendants, who had an equal and convenient ferry privilege on the Illinois shore; admits the defendants' ferry has reduced the profits of complainants' ferry; states that the west half, south-west thirty-three, ten north, six west, where the defendants and his associates have generally landed, does not belong to complainants, and insists on the right of defendants to land their ferry-boat within the three miles mentioned in the bill, to wit, where the State road strikes the river, and above the road as far as said west half, south-west thirty-three, ten north, six west extends, — 1st, because the road is devoted to the public; 2d, because the road is included in the grant to the Andersons; 3d, because the land does not belong to complainants as to the entire limit of the grant to the Andersons, and because the grant to Thruston and Webb was not exclusive; avers that the Andersons paid the bonuses and taxes, entered into the bonds, and performed all the acts required to obtain the benefit of the said ferry privilege, and makes a plat of a State road, marked S R, and the license to the Andersons, marked 4, a part of the answer; admits no compensation was made to Thruston and Webb or complainants for the ferry privilege granted to the Andersons; admits the complainants received from Thruston and Webb, on their purchase, possession of said ferry-privilege, boat, &c., as stated in the bill; but denies that they or Thruston and Webb had an exclusive right by law or in fact, and prays a dissolution of the injunction.

On the 5th November, 1846, the defendants filed an amended bill, repeating the substance of the original bill, and making John H. Goff and Isaac Nixon defendants, as purchasers of an interest in the ferry franchise granted to the Andersons, and requiring them to answer the original and amended bill, and praying for an injunction, &c.

On the 26th of November, 1848, the defendant Henry C. Anderson filed his answer to the amended bill, admitting that Goff and Nixon had, at the time of filing the amended bill, acquired an interest in the Anderson ferry, and, in conjunction with one of the original defendants, continued to run their said horse ferry-

boat and ferry passengers and property across the Mississippi River and land them within the limits of the complainants' ferry license; and alleges that the defendant, Henry C. Anderson, on the 18th September, 1847, purchased of Goff and Nixon all their interest in the said ferry, boat, &c., and received possession thereof, and now continues the ferry as aforesaid; and avers that in May, 1848, he purchased of N. &. L. Hopper a piece of land lying on the margin of the river on the Illinois shore and within the limits of the complainants' ferry, and files with his answer title-papers which show that on the 3d day of February, A. D. 1845, L. & N. Hopper acquired the legal title to fractional section twenty-eight, in township ten, north range, six west, in Henderson county, containing forty-six one hundredths acres, and that L. & N. Hopper sold the same to the defendant H. C. Anderson on the 25th May, A. D. 1848, by a title-bond for $200, payable in $50 payments, in thirty days, six, twelve, and eighteen months respectively, and to be conveyed when payments completed. At the foot of this answer it was admitted by Anderson that the ferrying done and mentioned therein was by the defendants done both ways across the Mississippi River, and the property and passengers transported and landed for hire within the limits of complainants' license.

Replications were filed to the answers aforesaid, and the defendants D. B. Anderson and Nixon and Goff were, as non-residents, duly notified by publication of the pendency of this suit, and the bills duly taken *pro confesso* against them for want of appearance and answer.

The cause came on to be heard at the September court, 1850, on the bills, answers, replications, exhibits, depositions, and parol testimony. The bills, answers, replications, and exhibits being read, the defendant then read certain depositions taken by him and on file, to show that the complainants had been inattentive to their ferry and regardless of the public accommodation, at times making travellers wait to be ferried over the river, and on several occasions being absent with their ferry-boat for several days, and once for several weeks, without providing other means for the public to cross the river.

The complainants then called a witness, who related that he

was and had been for several years, their agent in running their ferry; that in April, 1844, the ferry-boat was run to St. Louis for repairs, and was gone fourteen days; that that was the spring of the great freshet on the Mississippi River, and that when the boat was taken to St. Louis, and during all the time she was gone, the water was so high that the boat could not land within the limits of complainants' license; that the boat was never taken away or absent from the ferry at any time when a landing could be made within the limits of the license, but has at all times when not obstructed by ice in the cold weather, or by high water, been run as a ferry-boat according to the license; the boat and accommodation of the ferry have been suitable and sufficient for the travel; whenever the boat was undergoing repairs another boat sufficient for the purpose has been put on; the distance covered by complainants' license is three miles on the east bank of the Mississippi River, opposite Burlington; the bottom land between it and the bluff is low, generally over-flowed more or less every year, and the distance covered by complainants' license is necessary on that account to secure for the ferry a landing at the various stages of water; a less distance would not answer, and even with this distance it frequently happens that a landing cannot be effected within the limits of the license, either on account of the overflow of the bank of the river, or of the bottom between the bank and the bluff, covering the road so that passengers could not get out; when the water will permit, we always land within the limits of the license; the complainants have now on said ferry a new steam ferry-boat costing $8,000, and fully able and ready to accommo-date all travel; the Andersons and those claiming under them have at all times landed within complainants' ferry limits, and generally at the old State road and on complainants' land. The complainants have been regularly taxed and paid the taxes for their ferry, and generally land about one half mile north of where the defendants land. All the land owned by complainants lies continuously on the east bank of the river.

On the hearing the cause, the court dissolved the injunction, dismissed the bill, and decreed costs against the complainants.

Gales and Seaton sued out this writ of error, and brought the cause to this court.

BROWNING and BUSHNELL, for plaintiffs in error.

R. S. BLACKWELL, for defendants in error.

CATON, J. By the first section of the act of 12th February, 1827, it is provided: " That whenever it shall be considered necessary to establish a ferry or toll-bridge across any lake, river, creek, or any other watercourse within the limits or upon the borders of this State, or to turnpike or causeway any public road or highway, it shall be the duty of the County Commissioners' Court of the proper county, on due application being made by any qualified person or persons, to establish and confirm the same, by a special order to be made for that purpose, under such regulations, restrictions, and forfeitures as are hereinafter directed and pointed out." The 9th section of the same act provides that " the owner or owners, keeper or keepers, at all ferries and toll-bridges which are now or hereafter shall be established by law and kept agreeably to this act, shall have the exclusive privilege of the transportation or passage of all persons, their teams, horses, cattle, and other property, over and across the same, and be entitled to all the fare by law arising therefrom."

Under the authority conferred in the first section quoted, the County Commissioners' Court of Henderson county, on the 5th of September, 1842, passed the following order: " Ordained, that Thomas L. Thruston and John F. Webb have a license to keep a ferry across the Mississippi River, from the mouth of the running slough above the residence of Thomas Morgan, and opposite the city of Burlington, to extend down said river to where the slough enters into the Mississippi River, or big slough opposite the small island; that they shall have the privilege of landing at Montreal, in high water. And it is further ordered, that an order passed the 7th of September, 1841, granting license to William H. Manro to keep a ferry, be rescinded." Under this order, and the license issued in pursuance of it, the persons named therein established a steam ferry, which they maintained till the 6th of August, 1845, when they assigned their ferry-boat and franchise to the complainants, who have ever since maintained the same. The testimony shows that the distance be-

tween the two points named, extending along the east bank of the Mississippi River, is about three miles, and opposite the city of Burlington.

On the 25th of July, 1844, the same court granted a license to the Andersons by the following order: " Ordered, that the clerk of this court issue a license to David B. Anderson and Henry C. Anderson, of Burlington, Iowa Territory, to run a horse ferry-boat across the Mississippi River, from the Illinois shore to Burlington, with the privilege of landing as far north as the road near the line between towns 9 and 10 north, 6 west, and have the privilege of landing at Stockton when the water is high, or any intermediate point, upon the condition that they pay ten dollars tax, and file their bond, with approved security, conditioned according to law." In the exercise of the franchise thus granted, a horse-boat has been put on and kept up as a ferry, making a landing near the northern extremity of the limits prescribed in the order, and about a fourth of a mile south of the complainants' landing, and about a mile and a half north of the south line of the limits prescribed in the order granting the complainants' franchise. At least I infer these to be the facts, although the testimony fixing some of these points is very obscure, owing, no doubt, to the fact that it was not remembered, at the time the testimony was taken, that we are not as familiar with the relative location of the several points referred to, as were the persons then present. No controversy seems to have been made about these relative locations, else nothing would have been left to inference. The complainants allege that the establishment of this last ferry is an infringement upon their exclusive rights, which they seek to protect by a perpetual injunction.

That the complainants' franchise is exclusive, the statute leaves no doubt. The ninth section above quoted declares that the owner of such ferry " shall have the exclusive privilege of transportation or passage of all persons, their teams, horses, cattle, and other property, over and across the same, and be entitled to all the fees by law arising therefrom." Here is most unquestionably an exclusive right granted to the ferryman to cross all persons, &c., upon the ferry thus established. The word *same* refers to the ferry; and when we ascertain where the ferry is, we

36 *

Gales et al. *v.* Anderson et al.

know the extent of the complainants' exclusive privilege. We agree with the complainants' counsel, that the landing-place is a necessary appurtenant to, and is indeed a part of the ferry as much as the ferry-boat. But such appurtenance does not extend beyond the ferry ways or necessary landing place. That this was the understanding of this section, by the legislature, is manifest from the fact that they thought it necessary, two years after, to pass another law, in order to extend the exclusive privilege. This is found in the second section of the act of the 22d of January, 1829, which prohibits the establishing a ferry after the first day of May, in that year, when that act took effect, within two miles of any established ferry, on the Mississippi, Ohio, Illinois, or Great Wabash Rivers. As the law stood from the 1st of May, 1829, till the 19th of January, 1833, no rival ferry could be established on any of the rivers named, within two miles of an established ferry ; which, of course, gave the owner of such ferry an exclusive right of ferriage within that distance. By the act of the 19th of January, 1833, so much of the laws of 1827 and 1829 " as prohibits the establishing of any ferry on the waters of the Mississippi, Ohio, Illinois, or Great Wabash Rivers, within two miles of any such established ferry," was repealed. This certainly left the authority uncontrolled in the County Commissioners' Court, to establish upon the rivers named rival ferries as near each other as they should think the public good might require."

But it was insisted, that because the order of the court creating the complainants' franchise allowed them to establish a ferry across the river, from one point to another on the east bank of the river, which are three miles apart, their ferry embraces the whole three miles; that their landing-place is three miles long on the east bank of the river, and that, as their ferry embraces the whole of that distance, their exclusive rights are to that extent. If such is the proper construction of the order, and the court had a right to grant so extensive a franchise, there is no escaping the conclusion that the complainants' rights are exclusive to that extent. We are of opinion that the reasonable and necessary construction of this order, is that the grantees of the franchise should establish a ferry and fix their landing-place at

some point within the prescribed limits, and that the point thus selected should designate the location of their ferry, and limit their exclusive rights. In ordinary times, and in an ordinary stage of water, that it would be their duty to land there. When the stage of the water should render a landing there impracticable or inconvenient, they should have the right to land at other points. By changing their landing-place temporarily and from necessity, they should not be considered as abandoning their ordinary landing-place. The same construction must be given to the order creating the defendants' franchise. Should we adopt the construction contended for by the complainants, we should have to hold that the defendants' exclusive rights extend down the river to the county line, — the extent of the jurisdiction of the court, — for there is no southern limit prescribed in the order establishing the defendants' ferry, at least none except by implication. But both parties, in the exercise of their franchises, have acted in conformity to the construction which we give the orders creating them. The complainants selected their landing-place on the west half of the south-west quarter of section thirty-three, and their agent informs us that this is their exclusive landing-place in an ordinary stage of water. When the high water compels them to abandon this, they land temporarily at other points, according to the exigencies of the case. The defendants have selected and occupied their landing about a quarter of a mile below that of the complainants, upon or near the township line, landing temporarily at other points, when compelled to abandon their ordinary landing in consequence of high water. With this evidence before us, we cannot doubt as to the location of these two ferries, and the exclusive rights of each are confined to the ferries thus located and used. Should we hold that the complainants' ferry ways extend the whole three miles, as was contended on the argument, we might impose a burden upon them which would render their franchise valueless. If their ferry ways extend this whole distance, then they must be at all times ready to transport all passengers who present themselves within that distance, for they are bound to be prepared to transport all who present themselves on their ferry ways. But admit that their obligations would not be so exten-

sive, still they are certainly bound to afford reasonable accommodations to the travelling public seeking to cross the river at their ferry. There may be, and indeed the evidence shows that there are, several important thoroughfares terminating upon the river within the distance which the complainants claim as their exclusive ferry landing. Shall they run a boat to each of these points? If they have the exclusive privilege claimed, they are certainly bound to do so; and then they have two ferries instead of one, when the order certainly establishes but one ferry. Suppose Burlington had been on this side of the river, and the order had been to allow the grantees of the franchise to establish a ferry to and from that city, specifying no landing-place. Could it be said that the whole city front would constitute their ferry ways, and that no other ferry could be established with authority to land within the city, no matter what the public necessities might require? Could it be said that their ferry ways and exclusive rights extend over private property lying upon the river, the owner of which is by the statute entitled to a preference, if a ferry is to be established upon it, and upon which the complainants could not land without becoming trespassers? Would they be bound, or would they even have the right to run a ferry from each travelled street abutting upon the river? The reasonable construction of such an order would be, that they might select their point within the limits of the city, upon which they would establish their ferry, and that when selected, they had deferred their rights, which were before indefinite, perhaps with the right of changing their location, if they should choose to do so, without interfering with the rights of others. Suppose the order had authorized them to establish a ferry across the river from the county of Henderson to the opposite side, designating no point or any other limit, would it ever be contended that they had the exclusive right of ferriage on that river, for the whole county, and that all the travel of the county wishing to cross must come to one particular landing, or that they should or could establish a number of ferries many miles apart? Such a right or duty was not contended for under this license; and the County Commissioners' Court has no authority to grant a license to keep a ferry, with any more exclusive rights

than are guaranteed by the statute.    The commissioners cannot confer rights which will prevent them from establishing such other ferries as the public convenience may require.

The first section above quoted provides, " That, whenever it shall be considered necessary to establish a ferry," &c., " it shall be the duty of the County Commissioners' Court of the proper county, on due application being made by any qualified person or persons, to establish and confirm the same by a special order, to be made for that purpose," &c.   Here is a duty imposed, as well as a jurisdiction conferred, upon the Commissioners' Court.   The public convenience and the express law require them to perform this duty; and they cannot divest themselves of the power to do so, by granting rights inconsistent with its performance.   The commissioners are clothed with this jurisdiction, in order to subserve and promote the public interests, and not for their private benefit; and they have no right to barter away those public interests, by divesting themselves of the power to perform an important duty to the public, which the law conferring the jurisdiction enjoins upon them.   If they have a right to grant a ferry license in such a way as to prevent them from establishing other ferries, which, in their judgments, or in the judgments of their successors, the public good might require, they might impose an intolerable burden upon the community for all time to come.   It is no answer to say, that the law enjoins upon the grantees of the franchise, to put on as many boats, and to land at as many different points within the prescribed limits, as the public convenience may require.   As before shown, such a construction of the license might authorize and require the establishment of several different ferries, instead of one, while the establishment of but one was manifestly contemplated by the order.   If the commissioners have the right to grant to one man, or one company, the entire monopoly of ferrying to and from a particular city, they may grant to one an exclusive right to do all the ferrying in the county; and such a monopoly would not only shock the sense of propriety of every reflecting mind, but would be in palpable violation of the spirit and intent of the law.   We all know, what the testimony in this record makes most manifest, that, where there is an extensive line of travel, the public accom-

Gales et al. *v.* Anderson et al.

modation is not sufficiently subserved by placing in the hands of one man, or one company, an exclusive right to do all the ferrying, although they may be required by law to provide sufficient boats to do the business. The terrors of a legal prosecution are not sufficient to procure that prompt, eager, and zealous desire to accommodate the public, which are secured by the stimulating influence of rivalry. The evidence in this case shows, that the ferrymen upon the complainant's boat were much less accommodating, and that the public was much less efficiently served, before the defendant's boat was put on, than has been the case since. Formerly, it was a very common, if not a universal, practice, on the complainant's boat, to refuse to carry over a single passenger or team; but they would wait till others should arrive before they would make the trip; and it was not unfrequent for them to delay for hours, for no other cause. We are also told by the witnesses, that the public convenience has been materially promoted by the establishment of a new ferry, in securing the passage of the river at times when the old ferry could not or did not run. During one winter, the horse ferry-boat run from fifty to sixty days, when the steam ferry-boat refused to cross at all, but was laid up; and yet, if it had not been demonstrated, by the actual running of the defendant's boat, it might have been very difficult to establish in a court of justice that, during that time, the complainant's boat might have been run with safety. These considerations of public convenience are not referred to with a view of showing that any rights vested in the complainants may be taken from them in this mode; but they show the wisdom of the law in withholding from the County Commissioners' Court the power to grant a license which will prevent them afterwards from establishing such other ferries as the public good may require.

The whole scope of our ferry laws contemplate a ferry landing at some specified point. Thus, the third section of the act of 1827, under which this license was granted, provides as follows: "And such ferry keeper shall, at all times, keep the place of embarkation and landing in good repair, by cutting away the banks, and erecting wharves and causeways, when necessary, so that passengers, their teams, horses, cattle, and other property,

may be embarked and landed without danger or unnecessary delay." The location of the ferry is at such point of embarkation and landing, which the owner of the ferry is bound to keep in repair, and must be confined to such point, with the reasonable privilege of landing at other places, temporarily, when the stage of the water renders that necessary. At the point selected for his ordinary landing-place, are his ordinary ferry ways, and this is necessarily appurtenant to his ferry; and it is there that his exclusive right of ferrying exists, which is protected from intrusion under any subsequent grant. Suppose this had been a license to erect a toll-bridge, with the same description of location which we find in this order, the party might, with equal propriety, claim that his exclusive right extends over the whole three miles; and yet it has been expressly decided, that he would have defined and limited his rights by the selection of the location and the erection of the bridge. The Cayuga Bridge Company *v.* Magee, 6 Wend. 85. And that case even goes so far as to decide, that he could not change his location for the erection of a new bridge, after the first had been destroyed. The mere practicability of changing the location, does not vary the character or extent of the exclusive rights conferred. The same fiction, which would make a ferry landing three miles broad, might stretch the abutments of a bridge to the same extent.

When this license was granted, the right to locate the ferry was ambulatory within the three miles, till it was fixed by the establishing of the ferry, and the selection and occupancy of the landing-place; and we will not say, that the owners of the ferry might not afterwards change their permanent location, should they find it convenient and necessary to do so; and, as we know from the character of the river, from very necessity, they must have the right, at high water, to land temporarily at other points. This right is manifestly contemplated by the order itself; and this necessity may serve to explain the indefinite expressions used as to the location of the ferry. Surely it was never the intention of the court to compel the grantees of the franchise, under the third section of the act above referred to, to make a practicable landing, the whole extent of the three

miles upon the river; nor did they ever intend to assume any such obligation; and yet, such would seem to be their duty, if their ferry, — their place of embarkation and landing, — is thus extensive. They were, in our opinion, authorized by the order and license to select their landing-place within the prescribed limits. They did so select it; and there is their ferry, and to that is their exclusive right confined; and the establishment of another ferry, at another point, although within the same limits from which they were authorized to make their selection, is no infringement upon their rights.

The decree of the Circuit Court is affirmed.

*Decree affirmed.*