## DYER *versus* THE TUSKALOOSA BRIDGE COMPANY.

The Legislature has the same right to authorise the erection of toll bridges, by act incorporating a company for that purpose, which it has vested in the County Courts.

The keeper of a ferry, opposite to a town, under license from the County Court, keeps it subject to the public convenience; and the erection of a toll bridge near such ferry, by a Company, under charter from the Legislature, is not a violation of the vested rights of such ferry owner.

The principle, that private property can not be subjected to public use, without adequate compensation, does not apply to alleged losses, sustained by the owner of a ferry, (over a public water course, opposite a town, and who holds the same under grant from the County Court) by reason of the erection near it of a toll bridge, under a charter, granted by the Legislature.

The Legislature, in an act incorporating a Bridge Company, having provided a mode for assessing the damages which might be sustained by the owner of any land, selected as a scite and as a road to and from said bridge—such mode is conclusive, and the proprietor of land, so appropriated, must resort to the means pointed out by the statute, for compensation.

This cause was brought into the Supreme Court, by writ of error from the Circuit Court of Tuskaloosa, on the final decree of a chancellor, dissolving an injunction. The complainant filed his bill, praying an injunction against the erection of a toll bridge. He claimed, to be the proprietor of a ferry over the Black Warrior river, opposite the town of Tuskaloosa; which he held under a license from the County Court. The bill charged, that the defendants, by virtue of a charter granted by the Legislature, were proceeding to erect a toll bridge over the same stream, and within a short distance of the complainant's fer-

ry—that said bridge, if built, would prove of great injury to him, and eventually destroy his ferry—that he was the owner of lands on one side of the river, where the defendants were about to locate one of the abutments of the bridge, and a road leading therefrom. He insisted, that the passage of the charter, by the Legislature, was a violation of his vested rights, and prayed an injunction to restrain the company from proceeding.

PECK, for Plaintiff, said—A ferry is a franchise, and lies only in grant; and as such, it is a contract, within the meaning of the constitution.—See 6 *Cranch,* case of *Fletcher and Peck.* The parties to this contract are, the State and Dyer. The consideration on the part of the State, is comprised in the privileges granted, with all such as are incident thereto; and on the part of Dyer, the undertaking to keep up the ferry, and in a proper state of repair, for public convenience. The State could have no right to make a grant to another, afterwards, inconsistent with the grant of the ferry; and that the bridge privilege does destroy the ferry, there can be no doubt.

Was the grant of the ferry made on condition? And if so, was the subsequent grant within the condition? In regard to the condition, see *Aikin's Digest,* 363. Where there is a town, other ferries may be granted subsequent to the first grant; but that does not amount to a permission to grant the privilege of a bridge in the immediate vicinity, and thus destroy the first grant. Suppose this Bridge Company to be the first grantee: could the Legislature, in good faith, after the organization of the company, and after they had expended their thirty thousand dollars, grant a free bridge, so as to take away all the profits from them?

This act, granting the privilege of erecting a bridge, to a company, after the grant of the ferry to Dyer, is void, under the 10th section of the Constitution, which forbids a State from passing any law, impairing the obligation of contracts. Any act by which the contract is made worse, or of less value, is in violation of this part of the constitution. The State then, it is clear, is bound to protect the complainant in the privileges granted to him, and to do no act that will lessen the value of those privileges. The right of the Bridge Company to their grant, being incompatible with the grant to Dyer, cannot therefore be sustained. 3 *Story's Com.* 243, 350.

This act is also in violation of another provision in the Constitution, namely, that private property shall not be taken for public uses, without making compensation therefor. The northern abutment of this bridge is on the complainant's land ; and yet there is no provision in this act for making compensation for this injury to private property. The act, in this respect, is against the very letter of the Constitution.

If the Bridge Company may thus infringe on the rights of the complainant, he is left without remedy. This bridge is private property. The Legislature have no right to condemn the property of one citizen, for the benefit of another : and if this property should be considered as *quasi* public, there is still no provision in the act for making compensation.

This bridge cannot stand on air. It must, if built, be placed on some body's land. Can this be legally done until the land is condemned? And here there is no provision for that purpose. The road to and from the bridge is to be a public road. For that, there is a provision. As to the road, the fee remains in the owner still. The title of the land is not condemned—only

the use. The road may be discontinued, but the bridge being private property, is vested in the company—and if the complainant's property may be thus taken away, it is taken away forever. The only interest the public has in this bridge is the right of passing over it. How is that privilege secured ? It is not secured at all. The company may keep it open to-day, and close it to-morrow. They are not bound as in case of a ferry. They may nail it up at both ends : still the appropriation of the land is final.

This being a private act, it must be construed strictly, where it comes in conflict with the rights of a citizen. The company can take nothing by intendment. As to taking private property, they cannot do it without condemning it, and they cannot condemn it if the Legislature has not given them the power.—2 *Kent*, 284, '5, '6. Where the Legislature attempt to take private property for public use, the condemning power giving compensation, must be embraced in the act. The provision must be made at the same time that jurisdiction is assumed. If the Legislature take private property, not for public use, but take from A and give to B, they do what they have no authority to do.

This is not a public use. Those who pass, pay for it. The interest is in a private company.—2 *Bay's Rep.* 58.

CRABB, *contra.*—If the complainant has suffered any injury, his remedy is at law ; and a Court of Chancery has no right to take jurisdiction of the case. *Aikin's Dig.* 364 ; and to shew that an ample remedy is furnished at law, see *Aikin's Dig.* 357. Independent of this, if an injury has been done—if a nuisance has been set up, the party has his action on

the case. Chancery will not take jurisdiction of wrongs in the nature of trespass.

But, I contend that no injury has been done. I admit that the power of regulating highways, and the like, belongs to the sovereignty : here, to the Legislature, as to the Crown in England; but with this difference, that the Legislature hold their power under restriction; they cannot confer a franchise, raising a private property, inconsistent with the public convenience. If they grant a privilege to an individual, it must be with the restriction as to public convenience. But I contend that the grant of a ferry is a mere license, not a franchise or contract. The Legislature could not carve out to Dyer or any one else, a larger power than they possessed themselves ; and they possess no power but that to promote the convenience of the public. If a license to keep a ferry, be a contract at all, it depends on the public convenience continuing to require it.

The counsel spoke of the restrictions resting on the State as to the establishing of other ferries, within a certain distance of a ferry already granted.—There is no such restriction. The restrictions in the act, are on the County Court—not on the State or the Legislature. The restrictions do not apply in a town—nor to the establishment of a bridge after a ferry : these do not conflict. But these restrictions are imposed on the County Court, because the Legislature did not choose to part with their entire power. The State may still establish ferries nearer together—the public convenience being the guide. The restrictions on the County Court were not imposed for the benefit of the person to whom the grant was to be made, but for the benefit of the public. But, as to this grant to the Bridge Company, the Legislature

have granted the power themselves. See the case of *Hall* vs. *Ragsdale*, in this Court, June term, 1835.

With what view and understanding did Dyer accept the grant of this ferry? Certainly with a view to the existing state of the country, and with the knowledge that the Legislature, when the State of the country should require it, had power to erect bridges or establish other ferries.

There is no injury here, inconsistent with the true understanding of the original grant. If there is injury, it is incidental—the Court cannot know there is any injury; there may be custom enough for both. The provision of the Constitution, as to impairing the obligation of contracts, has never been understood to extend to political rights or powers, but to contracts affecting property.—1 *Kent*, 390. If the Legislature could grant away its political power, in the manner contended for, they might establish an aristocracy. The Legislature cannot control public concerns, or restrain public convenience by means of contracts. Look at the effect! Are we to be confined to the bad roads of the country, to save harmless some old grant? Are rail roads, bridges, and other internal improvements, to be thus restrained? It is impossible that the Legislature should have power thus by contract to restrain the improvements of society, for whose benefit the legislative body is constituted?

If the abutments of the bridge be on the land of Dyer, he can have his remuneration by writ of *ad quod damnum*. It cannot be necessary, that the act granting this charter, should provide for the *ad quod damnum*; the general law provides for it.—1 *Nott & McCord*, 387.

By Mr. Justice HITCHCOCK:

The complainant in this case, charges, that he, for

a long time has been, and now is, the proprietor of a ferry across the Black Warrior river, opposite the town of Tuskaloosa, under a license from the County Court of Tuskaloosa County ; that the defendants under, and by virtue of an act of incorporation granted by the Legislature of this State, are about to erect a toll bridge across the said river within a few yards of his ferry, which if completed will very materially injure, if not entirely destroy the value of his ferry. He further states, that he is the proprietor of a piece of land on the north side of the river, upon which the defendants intend to place one of the abutments of the bridge, and through which they intend to run a road leading from the bridge, out to the main public road, leading from his ferry to the country. He contends that this act of the Legislature is in violation of his private rights, and prays an injunction against the defendants, prohibiting the erection of the bridge.

The defendants have answered the bill, and have admitted the material facts as therein stated, but insist, by way of demurrer to the bill, that the complainant has not made out a case for the interposition of a Court of Chancery. The injunction, which was granted upon the filing of the bill, was, on hearing of the bill, answer and demurrer, dissolved, and the bill dismissed ; and the case has been brought to this Court for revision.

The complainant insists, that the grant to him of this ferry, is a contract between him and the State, and that this act of incorporation is unconstitutional and void.

I. Because it operates to the destruction of his grant.

II. Because it impairs the obligation of his contract with the State ; and,

III. Because it deprives him of his property, without due process of law, and without just compensation.

An investigation into the constitutionality of an act of a co-ordinate department of the government, is always a delicate, if not a painful duty. But, when the rights of individuals are concerned, and the question is distinctly presented, Courts have no alternative. Upon the faithful discharge of their duty, depends the "integrity and duration of the government :" and if the Court, in the investigation of this case, had found the positions assumed by the complainant, sustained by the constitution and the laws, they would not hesitate to pronounce the act complained of, void.

The Court has not, however, in the view which it takes of the complainant's rights, in this case, found any thing in the law complained of, which authorizes its interference.

The laying off, regulating, and keeping in repair, roads, high-ways, bridges and ferries, for the public use and convenience of the citizens, is an exercise of the supreme authority of the State, coeval with the institution of civil society, and indispensable to the free exercise of social and commercial intercourse, and as soon as men cease to roam abroad as savages, and lands become appropriated to private use, the reservation for public accommodation of a sufficiency for these purposes, is necessarily implied, and the mode of regulating its use, is necessarily vested in the State. It is a part of the *eminent domain*, and as such is treated by all writers on Public Law.[a] It is upon this principle that roads are laid out, and that the citizens are compelled to contribute either in money or labor to keep them in repair.

[a] Vattel, lib. 1, ch. 20, § 249, Bynkershoek, lib. 2, chap. 15. Domat, book I tit. 8, § 1.

Our Legislature, in the exercise of this authority, have delegated to the Judge of the County Court and Commissioners of roads in each county in this State, the power to lay out public roads, to discontinue and alter the same, when found useless, so as to make them more useful—to establish ferries, by granting licenses to individuals under certain regulations; and to erect free bridges, under the direction of the overseers, or to grant licenses for toll bridges to individuals, under certain regulations. But in all cases where ferries and toll bridges are authorised, the rights of the individuals to whom the grants are made, are held subject to the superior and paramount rights of the community. The only right secured by law to persons who have licenses to keep ferries, is that " no ferry shall be established within two miles of another already established," and in case of toll bridges within three miles, and this right does not extend to ferries opposite to towns. In such cases, as many ferries may be established as the Court may think proper; and in all cases bridges may be established along side of ferries, in the discretion of the Court; so that in this case, the right of the complainant was and is subject to the establishment of ferries, and the erection of a bridge even by the County Court, in the immediate neighborhood of his ferry. If the County Court could then, have authorised the erection of this bridge under the general road laws, it is not perceived that the Legislature, who have invested the County Court with this discretion, are prohibited from making the grant directly.

It is true, that the grant of a ferry is a franchise. There are a great variety of franchises;—some of them founded on valuable considerations, and necessarily exclusive in their nature, and which the gov-

²Aik. Dig. 375.
¹Aik. Dig. 363.

ernment cannot resume at their pleasure, or do any other act to impair the grant, without a breach of the contract. An estate in such a franchise necessarily implies that the government will not either directly or indirectly interfere with it, so as to destroy or materially impair its value, either by the creation of a rival franchise or otherwise.[a] But a grant of a ferry over a public water course, and for the convenience of the community, is not such an exclusive grant as is contemplated in such a case.

aKent's Com. 458, 459.

But, it is contended, on the part of the complainant, that, admitting the Legislature have the power, upon the principles of public policy, to authorise the establishment of this bridge, and thereby destroy the value of this ferry, that this can only be done by making adequate compensation to him for this loss; on the principle that private property cannot be taken for public uses, without just compensation. If this was a private and exclusive grant, founded upon a valuable consideration paid therefor, this argument would undoubtedly be good. But, if we have successfully shewn, that this is not such a grant, as we think we have, then this principle does not apply. What property has the complainant in this ferry, except in its use? and by what tenure does he claim the right to this use? It was originally granted to him for the benefit of the public: that public, it is now thought, require greater facilities—they have been granted; and if his profits are thereby lessened, has he any cause of complaint? He received his license subject to this contingency, and must abide by the consequences. Suppose the public convenience should require the road leading to a ferry to be changed, and the old road closed up. The County Court

has the power given to them to do this.   Can the owner of a ferry at the old crossing, say, that this must be done only upon paying him what he may loose by the change.   The fallacy of the proposition appears too plain to admit of elaborate illustration.

But, it is contended, that the Legislature have not only wrongfully destroyed the value of the ferry, but that they also wrongfully authorised the taking of plaintiff's land for the abutments and the road.

By the 9th section of the act incorporating this company, it is made the duty of the superintendents named in the act, to " select a site for the bridge, and also a site for a road leading to and from said bridge, and mark out the same, and apply to the court of roads and revenue for a jury to assess the damages, if any shall be claimed, for the lands the road may pass through, whose duty it shall be to appoint said jury, and as soon as the damages shall be paid by the company, to order the road to be opened, under the same rules and restrictions as other public highways, and which road shall be of the first grade, until it shall intersect other roads."

Admitting, that as well by the Common Law, as by the 13th article of our Bill of Rights, private property cannot be taken for public uses, without just compensation, yet the Court can see nothing in the section above recited which conflicts with this principle.   Here, as much ground as is necessary, for a road from the bridge to the main public road, is condemned, and placed upon the footing of other public highways; but before it can be taken, a jury is to assess damages, if demanded, which damages must be first paid before the ground can be used.   This is the ordinary mode of condemning the use of lands in such cases.   A transfer of the fee of the land to the

company was not necessary, and it is presumed, was not contemplated; and should the bridge be destroyed, and the company dissolved, the use of the ground would thereby revert to the original proprietor. It is decided in 2 *Bay's So. Car. Rep.* 38—that the Legislature of the country is vested with the power to pass laws for laying off roads and highways in every part of the State, and to appoint commissioners to see them kept in repair, whenever they may think convenient and proper, without any compensation to the owners of the lands through which they run. This it is said, is a part of the *lex terræ*—a condition attached to all freeholds, and which existed before *magna charta*. However this may be, as to compensation; in this case the Legislature have given the proprietor a mode of recovering damages, if he thinks proper to demand them, equal to the injury he may sustain.

We are, therefore, in every point of view, in which this case can be viewed, clearly of the opinion, that the decree below must be affirmed.