COMMONWEALTH *vs.* PROPRIETORS OF NEW BEDFORD BRIDGE

A corporation may be indicted for a misfeasance, as well as for a non-feasance.

An act of the legislature, authorizing the erection of a bridge over navigable water, is not unconstitutional, as interfering with the power to regulate commerce, granted to congress by the constitution of the United States.

An act of incorporation, authorizing the building of a toll bridge across a navigable river " with two suitable draws, which shall be at least thirty feet wide," constitutes, when accepted, a contract between the Commonwealth and the corporation, which cannot be affected by a subsequent act, requiring the corporation to maintain draws of a greater width; but obliges the corporation to enlarge their draws, when necessary for the convenient accommodation of vessels having occasion to navigate the river; and the question, whether the draws are thus suitable, is not to be determined by the legislature, nor by the corporation, but in the courts of justice.

INDICTMENT for a nuisance, occasioned by the erection and maintenance of a bridge in and across the Acushnet, a navigable river, flowing between the city of New Bedford and the town of Fairhaven, and thereby filling up and obstructing the navigation of the river. The indictment was found at June term 1852 of the court of common pleas.

At the trial in that court, before *Byington,* J. the defendants admitted that they had erected and maintained a bridge across the Acushnet River; that the bridge was so far an obstruction to

the navigation of the river, that its erection and maintenance could only be justified under an act of the legislature; and that, without such justification, they would be subject to a prosecution of some kind. But they contended that they were *not* liable to indictment.

The defendants gave in evidence their act of incorporation, (*St.* 1796, *c.* 19,) under which they acted in maintaining their bridge, and by the first section of which, after a preamble reciting that " William Rotch and others have petitioned to be incorporated, for the purpose of building a bridge over Acushnet River, in the town of New Bedford; and it appears that a bridge over the said river will be of public utility," William Rotch and others named are " constituted a corporation and body politic, for the purpose of building and supporting a bridge over said river, so long as they shall continue to be proprietors in the fund to be raised for that purpose, together with all those who are, or shall hereafter become proprietors of the said fund, under the name of The Proprietors of New Bedford Bridge." By § 3, " for the purpose of reimbursing the said proprietors the moneys by them expended, or that may hereafter be expended, in building and supporting said bridge, a toll is granted and established, for the sole benefit of said proprietors," according to certain rates specified. Said act also contains the following provisions:

" SECTION 5. Said bridge shall be well built, at least twenty four feet wide, of good and suitable materials, and be covered with plank or timber suitable for such a bridge, with sufficient rails on each side for the safety of passengers; and the same shall be kept at all times in good, safe and passable repair."

" SECTION 6. The said bridge shall be erected and placed as follows, to wit: Beginning at the west side of said Acushnet River, at a place called Smith's Point, at the east end of Middle Street in the village of Bedford, in said town of New Bedford; and from thence running to Fish Island, crossing the said island; and from thence to Edward Pope's Island; and crossing that island, directly on to the east side of said Acushnet River, landing between the village of Fairhaven and Oxford, in said town

of New Bedford; with two suitable draws, which shall be at least thirty feet wide; one the west side of said river, in the channel-way, and the other on the east side, in the most suitable place on that side of said river; which draws shall, at all times, when the said bridge is finished, be opened, when requested, for vessels which may have occasion to pass them."

The attorney for the Commonwealth, in reply, offered in evidence the act of 1851, *c.* 318, passed on the 24th of May 1851, by the first section of which the defendants, within six months from the passage of the act, are required to " make, and maintain in good repair, in lieu of the present draw in that part of their bridge which crosses the channel of the river nearest to the New Bedford shore, a new draw of not less than sixty feet in width ; the westerly abutment thereof to be eight feet further to the eastward than the westerly abutment of the existing draw ; the same to be constructed in such manner as shall be approved by a commissioner, to be appointed by the Governor, for the purposes of this act ; the expense of such commissioner to be paid by the said corporation."   The defendants objected to the admission of this act in evidence; but the judge admitted it; and the defendants conceded that they had not made such a draw of sixty feet in width.   But they proved that the width of the present draw, both before and since the act of 1851, was thirty two feet and some inches.

The presiding judge, " being of opinion that the several questions of law are so important or doubtful as to require the opinion of the supreme judicial court," directed a verdict of guilty, and reported the case, with the consent of the defendants, for the consideration of this court.

. The arguments were had at October term 1852.

*T. G. Coffin,* for the Commonwealth.   1. The obstruction of the Acushnet, a navigable river, was a nuisance, and rendered the defendants liable to indictment.   4 Bl. Com. 167.   Bac. Ab. Nuisance, A. B.   1 Hawk. *c.* 75, § 3.   *Arundel* v. *M'Culloch,* 10 Mass. 70.   By Morton, J. in *Charles River Bridge* v. *Warren Bridge,* 7 Pick. 444.   *Georgetown* v. *Alexandria Canal,* 12 Pet. 91.   By Taney, C. J. in *Pennsylvania* v. *Wheeling & Belmont*

29 *

*Bridge,* 13 How. 581. *United States* v. *New Bedford Bridge,* 1 Woodb. & M. 415. *Hogg* v. *Zanesville Canal,* 5 Ohio, 410. This is not a case for an information in the nature of a *quo warranto,* for here is no allegation of usurpation of a franchise, but of the obstruction of a navigable river, without right. But the remedy by information, if it exist, is cumulative, and does not take away the common law remedy by indictment as for a nuisance. *Commonwealth* v. *Ruggles,* 10 Mass. 391. *The State* v. *Godfrey,* 3 Fairf. 370.

2. The defendants cannot justify their acts under their charter. If their charter undertook to authorize the obstruction of navigable waters, it would be unconstitutional; for, although a state may grant a right of way across navigable waters, yet it cannot prevent or impair the use of such waters by any citizens of the United States who have occasion to use them. For, by the constitution of the United States, art. 4, § 2, citizens in each state are entitled to all privileges and immunities of citizens in the several states. And the power to regulate commerce, granted to congress by the constitution, art. 1, § 7, comprehended all the navigable waters of the several states, and rendered those waters the public property of all the people of the United States, for all purposes of navigation and commercial intercourse, subject only to congressional regulation. *Corfield* v. *Coryell,* 4 Wash. C. C. 371. *Bennett* v. *Boggs,* Bald. 60. *Gibbons* v. *Ogden,* 9 Wheat. 1. By McLean, J. in *Pennsylvania* v. *Wheeling & Belmont Bridge,* 13 How. 365. The decision in the case of *Commonwealth* v. *Breed,* 4 Pick. 460, depended on the question whether the defendant had complied with the provisions of his grant; and the remark of Morton, J. that " the legislature have power to regulate by laws all public highways and the navigable waters within the limits of the Commonwealth," was *obiter dictum.*

3. The terms of the defendants' charter do not authorize them to obstruct this navigation, but require them to make two draws, which must not only be " at least thirty feet wide," but also " suitable," that is, adequate to all the purposes of navigation. What was suitable sixty years ago, when the bridge was built, may not be suitable for the much larger vessels and steamboats

now used. The meaning of " suitable," in this act, is illustrated by its use in § 5, requiring the bridge to be built of " suitable materials." Must not those materials be suitable to sustain the loads ordinarily carried now, although much heavier than was customary when the bridge was built ? Besides ; by the act of congress of 1799, *c.* 22, § 2, New Bedford was established as a port of entry ; and congress have therefore so far legislated in relation to it, as to authorize vessels to enter, load and unload ; and as the geographical limits of this port are not restricted, the whole river is the port. Yet this bridge has not a suitable draw to enable vessels to enter ; so that, if the defendants' charter requires them to make such draws, they have not complied with it ; if it does not, it is in conflict with a law of congress, and is therefore unconstitutional. *Willson* v. *Blackbird Creek Marsh Co.* 2 Pet. 252.

4. But the legislature, by *St.* 1851, *c.* 318, have expressly provided how wide the draw shall be, and, by implication, what was meant in the statute by a " suitable " draw ; or, at all events, have determined the size of the draw for the future. And this statute was within the constitutional power of the legislature. The proposition that an act of incorporation granted by a legislature is in the nature of a grant or contract, and binding upon all succeeding legislatures, is not supported by any authoritative decision. In *Dartmouth College* v. *Woodward,* 4 Wheat. 518, the college had a grant from the king of England to themselves and their successors *in perpetuum.* But the legislature of this commonwealth, when legislating upon subjects of a public character, have no power to make such a grant. The legislature may grant all the title which the State has in the matter or thing granted ; but they cannot deprive themselves, or a subsequent legislature, of their authority to regulate the same public matter by subsequent acts. *Hartford Bridge* v. *East Hartford,* 16 Conn. 149, and 10 How. 534. *West River Bridge* v. *Dix,* 6 How. 507. *Charles River Bridge* v. *Warren Bridge,* 7 Pick. 464, and 11 Pet. 547, 548. *Portland Bank* v. *Apthorp,* 12 Mass. 258. *Goszler* v. *Georgetown,* 6 Wheat. 597, 598. *Clark* v. *Washington,* 12 Wheat. 54. *Brick Presbyterian Church* v. *New York,* 5 Cow. 542

5. It is no ground of objection that the indictment does not charge the defendants with not having complied with the requirements of the *St.* of 1851, *c.* 318. They are charged with erecting and maintaining a bridge that obstructs a navigable river, without authority of law; and they fail to show a justification.

*T. D. Eliot,* for the defendants. 1. For an offence of the nature charged in the indictment, this is not a proper form of prosecution. An indictment does not lie against a corporation for a misdemeanor or malfeasance, though it may for a non-feasance; for any act which is unlawful is not authorized by their charter, and therefore cannot be a corporate act. 1 Kyd on Corp. 225, 226. *Anon.* 12 Mod. 559. *The State* v. *Great Works Milling & Manuf. Co.* 20 Maine, 41.

2. The defendants' charter was within the constitutional authority of the legislature, although the bridge thereby authorized would obstruct navigable waters. *United States* v. *New Bedford Bridge,* 1 Woodb. & M. 407–416, 499, and cases cited. By Taney, C. J. in *Pennsylvania* v. *Wheeling & Belmont Bridge,* 13 How. 581. *Commonwealth* v. *Charlestown,* 1 Pick. 180. *Wales* v. *Stetson,* 2 Mass. 146. *Hood* v. *Dighton Bridge,* 3 Mass. 267. *Arundel* v. *M'Culloch,* 10 Mass. 70. *Charles River Bridge* v. *Warren Bridge,* 7 Pick. 445. *Charlestown* v. *County Commissioners,* 3 Met. 206.

3. The provisions of the charter were complied with by the defendants, by making a draw " at least thirty feet wide," and " suitable" in other respects. But even if " suitable " applies also to the width, there is no provision in the charter requiring the defendants to enlarge the draw, in any contingency.

4. The original charter, when accepted, became a contract between the Commonwealth and the corporation; and the *St.* of 1851, *c.* 318, which undertakes to impose additional duties and obligations on the defendants, and to take away their rights, without compensation, is unconstitutional. Angell & Ames on Corp. § 767. *Dartmouth College* v. *Woodward,* 4 Wheat. 518. *West River Bridge* v. *Dix,* 6 How. 542. *Rex* v. *Larwood,* 1 Ld. Raym. 32. *Boston Water Power Co.* v. *Boston & Worcester Railroad,* 23 Pick. 360. *Opinion of Justices,* 9 Cush. 604.

5. But if the *St.* of 1851 were constitutional, it would not be competent evidence to support this indictment, in which the defendants are not charged with non-feasance in not making a draw sixty feet wide, but with malfeasance in building a bridge. If judgment goes against them now, the bridge must be abated; whereas, if this were a direct proceeding against them for not widening the draw, the defendants, if found guilty, would have an opportunity to widen it. And such proceeding must be by information. Angell & Ames on Corp. § 736.

Bigelow, J. 1. The indictment in the present case is for a nuisance. The defendants contend that it cannot be maintained against them, on the ground, that a corporation, although liable to indictment for non-feasance, or an omission to perform a legal duty or obligation, are not amenable in this form of prosecution for a misfeasance, or the doing of any act unlawful in itself and injurious to the rights of others. There are *dicta* in some of the early cases which sanction this broad doctrine, and it has been thence copied into text writers, and adopted to its full extent in a few modern decisions. But if it ever had any foundation, it had its origin at a time when corporations were few in number, and limited in their powers, and in the purposes for which they were created. Experience has shown the necessity of essentially modifying it; and the tendency of the more recent cases in courts of the highest authority has been to extend the application of all legal remedies to corporations, and assimilate them, as far as possible, in their legal duties and responsibilities, to individuals. To a certain extent, the rule contended for is founded in good sense and sound principle. Corporations cannot be indicted for offences which derive their criminality from evil intention, or which consist in a violation of those social duties which appertain to men and subjects. They cannot be guilty of treason or felony; of perjury or offences against the person. But beyond this, there is no good reason for their exemption from the consequences of unlawful and wrongful acts committed by their agents in pursuance of authority derived from them. Such a rule would, in many cases, preclude all adequate remedy, and render reparation for an injury, committed by a

corporation, impossible; because it would leave the only means of redress to be sought against irresponsible servants, instead of against those who truly committed the wrongful act by commanding it to be done. There is no principle of law which would thus furnish immunity to a corporation. If they commit a trespass on private property, or obstruct a way to the special injury and damage of an individual, no one can doubt their liability therefor. In like manner, and for the same reason, if they do similar acts to the inconvenience and annoyance of the public, they are responsible in the form and mode appropriate to the prosecution and punishment of such offences. Angell & Ames on Corp. §§ 394–396. *Maund* v. *Monmouthshire Canal,* 4 Man. & Gr. 452, and 5 Scott N. R. 457. *The Queen* v. *Birmingham & Gloucester Railway,* 3 Ad. & El. N. R. 223. *The Queen* v. *Great North of England Railway,* 9 Ad. & El. N. R. 315, and 2 Cox C. C. 70. *Eastern Counties Railway* v. *Broom,* 6 Exchequer Reports, 314. *The State* v. *Morris & Essex Railroad,* 3 Zab. 360. If, therefore, the defendants have been guilty of a nuisance, by obstructing unlawfully a navigable stream, an indictment may well be maintained against them. It may be added, that the distinction between a non-feasance and a misfeasance is often one more of form than of substance. There are cases where it would be difficult to say whether the offence consisted in the doing of an unlawful act, or in the doing of a lawful act in an improper manner. In the case at bar, it would be no great refinement to say, that the defendants are indicted for not constructing their draws in a suitable manner, and thereby obstructing navigation, which would be a non-feasance, and not for unlawfully placing obstructions in the river, which would be a misfeasance. The difficulty in distinguishing the character of these offences strongly illustrates the absurdity of the doctrine that a corporation are indictable for a non-feasance, but not for a misfeasance. See 9 Ad. & El. N. R. 325.

2. We now come to a consideration of the grounds on which the Commonwealth seeks to maintain this indictment. In the first place, it is contended that the legislature, in granting an act of incorporation to the defendants, authorizing them to construct a

bridge over navigable waters, exceeded their constitutional power, and that the act is therefore null and void. This argument rests on the clause of the constitution of the United States, by which the power to regulate commerce between the states is given exclusively to the federal government. But it is too well settled, by the uniform practice of the several states, as well as by judicial decisions, to be now drawn in question, that the power given to congress, under the constitution, to regulate the use of and passage over the navigable waters of the several states, does not impair the right of the state legislatures to enact laws upon all subjects of internal police within their territorial limits ; provided such enactments do not interfere with the regulations of congress on the same subject ; and that acts of a legislature, authorizing the construction of bridges over navigable waters within their own state, come within this principle, and are not unconstitutional. Angell on Tide Waters, (2d ed.) 64, 65, 106. *Commonwealth* v. *Breed,* 4 Pick. 460. *Dyer* v. *Tuskaloosa Bridge,* 2 Porter, 296. *The People* v. *Rensselaer & Saratoga Railroad,* 15 Wend. 113. *United States* v. *New Bedford Bridge,* 1 Woodb. & M. 407, 416. So far, therefore, as the Commonwealth seeks to maintain this prosecution on the ground that the original act incorporating the defendants is unconstitutional, the indictment must fail.

3. But the main ground on which the Commonwealth relies, to sustain the present indictment, is the failure of the defendants to comply with the provisions of *St.* 1851, *c.* 318, by which they are required to construct and maintain, in their bridge across the channel of the river, a draw of not less than sixty feet in width. The defendants admit that they have not constructed a draw in compliance with this legislative requirement, and rest their defence to this part of the case on the unconstitutionality and invalidity of the act, by which this duty is imposed upon them. To determine this question, it is necessary to recur to the original act incorporating the defendants, *St.* 1796, *c.* 19. There can be no doubt as to the legal relations, created by this act, between the government and the defendant corporation. On the part of the former, it was a grant, in consideration of the expected ben-

'efit to the public, of the right to construct and maintain a bridge over navigable waters, to be built in the place and mode, and of the size and materials, specified in the act; on the part of the latter, it was a stipulation, in consideration of the right to: take the toll by the act created and established, to erect and support a bridge across the river, according to the terms and conditions, and of the kind and dimensions, in the act set forth and described. Upon familiar and well settled principles, the act, when accepted by the defendants, was an executed contract between them and the government, by the terms of which, as contained in the charter, both parties are equally bound. The defendants cannot, without the consent of the legislature, escape or evade any of the duties or obligations imposed upon or assumed by them under the act; nor can the legislature, without the assent of the defendants, in any way affect or impair the original terms of the charter, by annexing new conditions, or imposing additional duties, onerous in their nature, or inconsistent with a reasonable construction of the compact. Angell & Ames on Corp. §§ 31, 82, 767, and cases cited. *Wales* v. *Stetson*, 2 Mass. 146. *Nichols* v. *Bertram*, 3 Pick. 342. *Boston & Lowell Railroad* v. *Salem & Lowell Railroad, ante,* 30.

. 4. We are then brought directly to the question, whether the defendants are bound to comply with the provisions of *St.* 1851, c. 318, by which they are required to erect and maintain a new draw in their bridge across the channel of the river, to be built of the size and in the manner therein specified; and are liable to indictment, solely for a neglect and refusal to carry its requisitions into effect. Applying to the original charter of the defendants, as we are bound to do, the ordinary rules regulating the interpretation and construction of contracts, it will be found that the extent of the duty imposed on them, respecting the erection and construction of the draws over the channel of the river, is clearly set out and defined. They are to erect " suitable draws, which shall be at least thirty feet wide; " that is, the minimum width of the draws is prescribed. In all other respects — in their construction, materials, dimensions, and operation — they are to be adapted to the locality in which they are to be erected, and to

the wants and necessities of those who may have occasion from time to time to use them for the purpose of navigating the river above and below the bridge. The corporation could not legally make either draw less than thirty feet wide; they were not bound to make it of greater width, unless the convenience and accommodation of the public, having occasion to pass the bridge, or to navigate the river, rendered its enlargement proper and necessary These were the terms and conditions prescribed by the legislature, on the subject of the erection and maintenance of the draws over the channel, upon the faith of which the defendants accepted the charter, assumed the duties imposed by it on them, and expended their money in the construction of the bridge. No power to amend or change the charter was reserved to the legislature. The respective rights and duties of the parties to the contract must therefore be determined solely by its original provisions Tried by this test, there can be doubt that the *St.* of 1851, *c.* 318 imposes new and additional burdens on the defendants, not contemplated by their act of incorporation. It raises the minimum width, prescribed for the draw over the channel, from thirty to sixty feet; it requires the defendants to make and maintain a new draw, in lieu of the one then existing, to be not less than sixty feet in width; and to remove the westerly abutment thereof to a point eight feet further to the eastward than the westerly abutment of the existing draw; and directs that this draw shall be constructed within six months from the passage of the act, in such manner as shall be approved by a commissioner to be appointed for the purpose by the governor, the expense of such commissioner to be paid by the corporation. It certainly requires no argument to prove that these requirements are of an onerous character, and that they materially change the nature of the structure, which the defendants were required to erect by their original charter. Indeed, this is not denied by the learned counsel for the Commonwealth. But it is urged, and this constitutes the stress of the argument on this part of the case, that the use of the term " suitable " in the act incorporating the defendants, as applied to the construction of the draws, being a term in its nature indefinite and uncertain, did not fix and absolutely settle

the duty and obligation of the defendants in this particular; that these, with the exception of the minimum width of the draw, were thereby left open and undetermined, and by necessary implication the legislature have the right reserved to them of regulating from time to time the construction of the draws, and of prescribing what shall be suitable, as respects their location, materials and dimensions. But we cannot yield to the force of this argument. It is founded on an entire misapprehension of the relations of the parties, as created by the act of incorporation. They are but parties to a contract. Each has equal rights and privileges under it, and neither can interpret its terms authoritatively, so as to control and bind the rights of the other. The Commonwealth has no more power or authority to construe the charter, than the corporation. By becoming a party to a contract with its citizens, the government divests itself of its sovereignty with respect to the terms and conditions of the compact, and its construction and interpretation, and stands in the same position as a private individual. If it were otherwise, the rights of parties contracting with the government would be held at the caprice of the sovereign, and exposed to all the risks arising from the corrupt or ill judged use of misguided power. The interpretation and construction of contracts, when drawn in question between the parties, belongs exclusively to the judicial department of the government. The legislature have no more power to construe their own contracts with their citizens, than those which individuals make with each other. They can do neither without exercising judicial power, which would be contrary to the elementary principles of our government, as set forth in the Declaration of Rights, art. 30. No better illustration of the dangerous consequences, which would follow from a different doctrine, could be had, than is afforded by the case at bar. If the legislature have the power to decide upon the true meaning of the terms of the contract, and to determine what shall be deemed suitable in the construction of the bridge and draws, there can be no limit placed upon the exercise of this power. If they have the right to prescribe a draw of sixty feet in width, they may hereafter require the defendants to extend it to one hundred

feet, or to build it across the entire space between the shore and the adjacent island. So, too, in regard to the construction of the bridge itself. The act of incorporation required that it should " be well built, at least twenty four feet wide, of good and suitable materials." By parity of reasoning, it would be competent for the legislature to enact that the bridge should be rebuilt one hundred feet in width, and be constructed of iron. In a word the argument leads directly to the conclusion, that the legislature have the power to annex new and onerous conditions to the contract, at their pleasure, and thus effectually destroy the value of the franchise granted to the defendants. Such a doctrine cannot be maintained without overthrowing all the salutary and well established principles applicable to this species of contract between the government and its citizens. For these reasons, we are of opinion, that the act of 1851, *c.* 318, *ex proprio vigore*, has no binding force upon the defendants, and that this indictment cannot be sustained against them upon proof of a neglect and refusal to comply with its requisitions.

4. But it by no means follows that the defendants are not liable to prosecution, if they have failed to fulfil the duty imposed upon them by the original charter with respect to the construction of the draws in their bridge. If the legislature have no power to determine absolutely what is suitable in this particular, neither have the defendants. We cannot assent to the argument urged upon us in their behalf, that, by the true interpretation of the original act, the defendants were bound only to erect a bridge with draws which were suitable and adapted to the accommodation of navigation on the river at the time of their construction, and that if they continued to maintain them with the same materials, dimensions and mode of operation with which they were originally built, the duty imposed on them by the terms of their charter was fully complied with. We think the scope and purpose of the act were much broader, and that it was framed with a wise forecast to meet future exigencies. In granting to the defendants the right to build a bridge over a navigable stream, and thereby to create a partial obstruction to the freedom of the public in passing over it, the legislature intended

to provide as far as possible against any serious interruption, present or future, to the passage of vessels, so long as the defendants should continue to maintain their structure. They did not intend, therefore, to fix and limit the dimensions of the draws by the necessities of the public navigation upon the river at that early period; but, by requiring that they should be " suitable," they imposed on the defendants the duty of adapting them to the passage of such vessels as, in the progress of time, and the advancement of commercial intercourse, might have occasion to navigate the river above and below the bridge. It is not the duty of the defendants merely to make their draws of a width not less than a certain *minimum* fixed by the act, as was the case in *Commonwealth* v. *Breed*, 4 Pick. 460 ; but they are also required to construct them so that they may be from time to time " suitable " for the convenient navigation of the river. If therefore, by reason of the increase in the size of vessels, or of a difference in their mode of construction, or from any other cause, it has become necessary to the convenient passage of the river, that the draws of the bridge should be enlarged, the defendants are bound to adapt them to the present exigencies of public navigation ; and if they fail to do so, they violate the duty imposed on them by the terms of their charter, and thereby cause an unlawful obstruction to a navigable stream. This construction of the original act incorporating the defendants is the necessary result of a fair construction of the language of the act, applied to the subject matter. It follows, as a necessary consequence, that if the draws, as they are now constructed in the defendants' bridge, are not suitable and proper for the convenient accommodation of all vessels having occasion to navigate the river; but are deficient in their construction, mode of operation or dimensions, so as unreasonably and unnecessarily to impede their passage through them, then the defendants are guilty of a public nuisance, which subjects them to indictment. Angell on Tide Waters, 115. 1 Russell on Crimes, (7th Amer. ed.) 378, 379. *The King* v. *Ward*, 4 Ad. & El. 384.

Whether the defendants have in fact complied with the terms of their charter, by constructing their draws in a suitable man-

ner, so as not unreasonably or unnecessarily to obstruct or impede public navigation, is a question which neither the legislature nor the defendants can determine absolutely, without the assent of the other, when it is drawn in question between the defendants and the Commonwealth. Like all other matters involving a controversy concerning public duty and private right, it is to be adjusted and settled in the regular tribunals, where questions of law and fact are adjudicated on fixed and established principles, and according to the forms and usages best adapted to secure the impartial administration of justice.

5. A question was suggested by the counsel for the defendants, as to the sufficiency of the present indictment, on the ground that it does not specifically charge the defendants with an insufficient, improper or unsuitable construction of their draws, but avers that they have created a public nuisance by the erection of their bridge and by filling up and obstructing the channel of the river. Upon looking at the report of the case signed by the judge who tried the cause in the court below, it does not appear that any such question was raised at the trial, or reported for our decision. No objection seems to have been taken to the form of the indictment, except at the argument of the case at the bar of this court. Without having fully considered the question, we are inclined to the opinion that the indictment is not open to the objection urged by the defendants. If, on a new trial, it shall be deemed expedient to raise the question in a regular form for the consideration of this court, it will be then proper to pronounce a formal adjudication upon it.

*Verdict set aside.*