*McCay, Judge.
Whilst we are very clear that our judgment in this case is right, we cannot forbear expressing our regret, that the enforcement of a stern rule of law operates hardly upon the plaintiffs in error. We feel satisfied that the plaintiffs have, at any rate, in their action since the war, supposed they had this exclusive right, and that they have expended money under that impression, which, perhaps, they would not have expended had they been aware that their contract with the. Inferior Court for this exclusive right was invalid. And were it possible for us, without violating the law, to sustain their grant, we would cheerfully do so. But, in our judgment, the Inferior Court of Floyd county had no authority to make such a grant, and to recognize it would be to establish a dangerous precedent — both because it would be the making of a law by this Court, and because such a law would be in itself a bad one, contrary to good policy and against the public interest. The Act of 1805, section 1, is as follows: “The Inferior Courts of the several counties of this State are hereby empowered, if they should deem it necessary, on application being made, to authorize the establishment of such ferries or bridges as they may think necessary, other than where ferries and bridges have already been established by *289 law, and to allow such rates,” etc. Provided that the Legislature shall at all times retain the power of making such alterations in such establishments made by the Justices of the Inferior Courts, as to them shall seem proper. The plaintiffs in error claim that they have the exclusive right to build bridges over the Coosa and Etowah rivers, for three miles in each direction, from the point of their junction in Floyd county, and they claim this by virtue of a contract made with them by the Inferior Court of Floyd county, in June, 1851. Upon this contract they say they have acted from that day till this, expending their money and doing other acts which they would not have done except for that contract.
As we have said, we think the abstract equity of the matter *is with the plaintiffs, and it is only because we think the Inferior Court had no power to make such a rontract, or to bind the public by their action in it, that we feel constrained to affirm the judgment of Judge Plarvey refusing the injunction.
The Inferior Court (now the Ordinary) is not and never was the public. It is the mere agent of the public, clothed by law with authority to do for it certain specified acts. It is a settled rule, not only in this State but in all the States, and in England, that such public agents have only such powers as are granted them; that they take nothing by implication, and that the law granting their powers is to be strictly construed: 13 Howard, 81; 1 Kelly, 533; 3 Kelly, 31; Kelly, 561; 6 Wend., 85; 27 N. Y., 92; 21 Penn., 22; Cooly’s Con. Lim., 196-7, and note.
The Act of 1805 simply confers upon the Inferior Court the power to authorize the establishment of bridges and ferries, and to fix the rate of toll. The power to grant to any one an exclusive right, if it exist, must be derivable from this power to establish. Can such a power be so derived, under any rule, con-, sistent with the authorities? When this grant was made, (1851) there existed, by the laws of this State, (Act of 1850, Cobb’s Digest, 958,) a right in the owners of the land above and below this bridge to build, at their pleasure, bridges over it, on their own land. Could the Inferior Court, under this general power, quietly, at their office, convey to these plaintiffs this right, then belonging to other people? We think not. The right to grant an exclusive privilege to build a bridge does not, either m its words or by any fair construction, arise from a mere right “to authorize the establishment of bridges.” It is not a necessary incident, since it is only in few cases that such exclusive privilege is granted. It may be true that there are cases where parties would be unwilling to erect bridges unless they could get a guarantee that no one else should build within two, or perhaps ten miles. But to infer the power from this would open a very wide scope to the powers of the county officials, since it is just as true that there *are cases where a bridge could, perhaps, be'put up if the builders could be exempt from tax — have a right to issue bank bills, etc., and thus, under the *290 power to establish a bridge, the Inferior Court would draw to itself the power to do almost anything.
The right to have a franchise is one thing; the right to deny to any others, for all time, to have another franchise is another and quite a different thing. The one is a grant, the other is a contract that the public will not grant to others. They are such rights, different in nature and character, and it may well be that the Inferior Court had full power to grant the one and no power to do the other. The Inferior Court was a public agent; it had a duty cast upon it' to authorize such bridges as it then thought necessary. The duty was a continuing one. It existed after this bridge was authorized, it continues still, and it was not, and is not, in the power of the Court to abrogate it.
We have looked into the authorities on this subject and find them uniform. In 6 Wheaton, 597, Chief Justice Marsharr, in discussing the right of a city to regrade streets after it had done acts from which a contract not to regrade was implied, says: “The power tg graduate was a continuing one, given by the Legislature, and was not exhausted by its first exercise.” And Judge Lumpicin, in 23 Georgia, 404, after repeating this same thought, adds, “and any agreement to fetter or clog this power would be void.” Dillon, in his work on municipal corporations, lays down the doctrine broadly, thus: “Powers are conferred on municipal corporations for public purposes, and, as their legislative powers cannot, as we have seen, so cannot they be bargained or bartered away:” Dillon on Mun. Cor., 110, and cases cited. That the power to grant an exclusive right is not derivable from the power to establish, is settled by a very numerous body of authorities. Boroughs and towns (much more mere quasi corporations, like county boards and overseers,) have only authority to bind the public when the authority is expressly given: 12 Ga., 424 ; 6 Peters, 729; 9 Cranch, 87; 10 Ga., 206 ; 8 Conn., 254; 10 Conn., 254; 30 *Maryland, 218; 7 Cranch, 366. In 9 Georgia, 525, this Court, quoting Judge Taney, says: “When a corporation alleges that a State has surrendered for seventy years its power of improvement and public accommodation in a great and important line of travel, along which a vast number of its citizens must daily pass, the community have a right to insist that the abandonment ought not to be presumed, unless the deliberate purpose of the State to do so does clearly appear.”
That the power to grant exclusive rights does not in such cases exist is settled by the following cases: 10 Mississippi, 530; 10 Howard, 511; 13 Illinois, 413-424 ; 9 Mississippi, ....; 21 California, 238. In 25 Connecticut, 31, a city had granted to a company an exclusive right to lay gas pipes, and the grant was held void; 2 Porter, 296; see, also, 18 Ohio, 262; 23 Howard, 435. This case in 23 Ploward is very like the case at bar, and contains the authority of the Supreme Court of the United States upon the very exact question made in this record! There the Legislature had authorized a municipal corporation, as it has *291 here doiie the Inferior Court, to establish ferries. The corporation, in establishing a ferry, granted to the grantees an exclusive right. The Supreme Court of the United States held the grant void, as beyond the power of the corporation. The Act of 1845, Cobb’s Digest, 957, which has been claimed as conferring some additional power on the Court, does not apply to public bridges owned by private parties, and was simply authority to the Court to take any method it saw fit to have its own bridges built and kept in repair instead of the mode -hitherto provided, of a board of commissioners and a bond to keep the bridge up for five years. Nor do we think the change in the Constitution, divesting the Legislature of the power to establish ferries and bridges, and providing that the General Assembly shall confer it upon the Courts, affects the question. The Legislature has not, under this clause, yet provided any authority to a Court to grant an exclusive right and we doubt if it can do so. The truth is,. the existence of such a power is a dangerous one at any rate. One that ought not to pass out of the Legislature, and is greatly *liable to abuse there. By our laws now, the Ordinary may charter a hotel company, a manufacturing company, etc. Can it be that as the Constitution clothes the Ordinary, as an incident to this, with the right to contract that no other company shall be chartered? It seems absurd to say so, and yet this is the inevitable result of the logic insisted upon.
We sympathize, as we.have said, with the plaintiffs in error. It may be that this bridge will hurt their enterprise. But if they have no legal grant, they have no legal redress; it is damnum absque injuria — hurt without wrong — disadvantage without illegality. The public is under no legal duty to them, and has violated no legal right in them. When this is the case, however much may be the hurt, there is no redress. The party hurt took the risk; acted with his eyes open to the probable consequences. Nor was there any thing, either in the case itself, or in the language of Judge Lumpkin in his opinion in Shorter vs. Smith, 9 Georgia, 517, to justify the action of the Inferior Court in making this contract. .The question there was, had such a contract been made? This Court decided not. There was no call for an investigation of the power of. the Court to make it. Nor does the language of Judge Lumpkin intimate that any such power existed. True, he says the Legislature may grant to a local agent the authority to exercise the right' of eminent domain, and adds that such a power in local bodies had always been exercised. And this is very true. The authority to lay out roads is such an authority, and from our earliest history it has been exercised by local bodies. But we doubt if the power to contract away the right of the public to have a bridge over a stream, can be classed under the right of eminent domain at all. At any rate, it is clear that Judge Lumpkin in his remark, was alluding to the right of establishing bridges, which it was contended could not be delegated, and not the right to abrogate the duty, conferred by the Act of 1805. So, too, when he speaks of the Inferior Court as *292 the agent of the Legislature. He is treating of the right of the Court to authorize the laying out of roads and establishing ferries and bridges, and not of any ^authority in the Court to contract that no bridge shall be established within certain limits, beyond the immediate vicinage of the bridge authorized, so as to obstruct the franchise.
Altogether, as we have said, we think the want of power in the Court to make this contract is clear; that the plaintiffs got no exclusive right under it; that their expenditure was at their own risk, and if they have been mistaken it is their misfortune.
Judgment affirmed.